### RAMOPA CO. v. A. GASTUN & CO., Inc.

(District Court, S. D. New York. January 27, 1922.)

1. **Trade-marks and trade-names and unfair competition** &#9760;59(5)—**The brand "Maropa" held to infringe word "Ramopa."**

    The trade-name "Maropa," when used in connection with coarse cotton, *held* to infringe the trade-mark "Ramopa."

2. **Trade-marks and trade-names and unfair competition** &#9760;93(3)—**Trade-mark held infringed from beginning of the use.**

    Evidence *held* to show that the trade-mark "Ramopa" was knowingly infringed by defendant from the beginning of the use by it of the trade-mark "Maropa," and that plaintiff was entitled to an accounting from that time.

In Equity. Suit by the Ramopa Company against A. Gastun & Co., Inc. Decree for plaintiff for accounting.

Munn, Anderson & Munn, John K. Brachvogel, and Orson D. Munn, all of New York City, for plaintiff.

Barry, Wainwright, Thacher & Symmers and A. C. Charles, all of New York City, for defendant.

LEARNED HAND, District Judge. [1] The first question in the case is whether there should be a decree of injunction. On that, I am of the same opinion as I was when the case was up for preliminary injunction. All the witnesses agree that these goods in the Levant are sold more by the name than by the "chop." When I say all of the witnesses, I should not forget the defendant Gastuniotis. He differs in that respect, but he is the only one. I find the fact to be that it is by the name that the goods are sold, by which I mean sold either to the consumer or to the small retailer. These are, of course unfamiliar with the English language, and probably relatively unfamiliar with the Latin script, and to them the rest of the words on the head end are entirely meaningless. But the word "Ramopa," although it is written in a language foreign to them, and even in a character foreign to Turks, they can fix in their minds. To argue that the difference arising from

the transposition of the letters "R" and "M" is a sufficient distinction seems to me beyond any fair entertainment whatever. I have no doubt that confusion would be likely to arise, and, if so, the defendants must be prevented from imposing the risk of it upon the plaintiff.

[2] The question next comes up of the accounting. Of course, the accounting must go from the time of the notice on May 3, 1921; but that may well result in nothing. Perhaps the defendants shipped no more goods under that trade-mark after that time. The real importance of the case to both sides arises on the question whether the accounting shall go back further. There is no direct evidence of notice prior to May 3d of last year. Apparently the infringing word was devised and began to be used at the very end of 1918, so the defendants were using it about 2 years and 4 months before they got notice, and, the issue is whether the circumstantial evidence is cogent enough to overbear the denial of Gastuniotis that he had any knowledge.

Just what was the situation in respect of this name? The plaintiff had a business of substantial amount in Constantinople and the Piræus in the year 1917. They sold a little short of 1,000,000 yards of coarse cottons under their trade-mark. That was a good business. In the year 1918 it fell to about half what it had been in 1917, but still it might well be supposed to have possibilities, and in fact subsequently realized possibilities beyond what I suppose were even their expectations. They marketed their goods, as apparently every one must in the Levant, by employing importing agents who got orders, which come direct to New York, where they are filled. The agents were themselves Greeks, and they circulated among the importers, drumming up business. The defendants are also exporters and importers, who have offices or agencies in the Piræus. Their business is done in the same way; they circulate among buyers, drumming up business.

It seems to me stretching credulity beyond its breaking point to suppose that, when they went into the business of selling coarse cottons, and when they in the nature of things probably got some of that business through the same people who bought from the plaintiff, they should not have become acquainted with the brands and the names under which the plaintiff was selling. We start, therefore, with the great likelihood that they did. We find them adopting a name which, if they had intended to use the plaintiff's trade-name, is just enough removed from it to make a colorable argument on which they might stand, a name which itself means nothing, and must have been invented as an arbitrary trade-mark. This name has just the same letters as the plaintiff's trade-mark, arranged in precisely the same order, except that there is a transposition of two of them, the "r" and the "m". Let us remember that this was done by people who were competing with the plaintiff, and who were in a position where the probabilities are nearly inevitable that they should have had knowledge of the plaintiff's name.

I come, then, to the explanation of how the word was devised. I am assured that it was made up of a Spanish word and a French word. The Spanish word was thought up by this gentleman when he was in Cuba. Salonica, as every one knows, is settled very largely by Spanish Jews; they form the merchant class there, and Spanish Jews would

know Spanish, and in Spanish the word for tunic or dress is "ropa." Then it would be desirable, as French is well known in the Levant, that there should be a combination of languages and the possessive French pronoun might be added to "ropa." I may assume that "ropa" is feminine in Spanish, though I do not even know whether Spanish has a gender. At any rate, we may combine "ma," the feminine of the possessive pronoun, "mon," which is "my" in French, with "ropa," the name in Spanish, and so we get a word which is to a certain extent descriptive. This is the explanation offered to meet a situation where every antecedent probability points to the fact that the plaintiff's trademark must have been known, and that the word actually devised was one apt to produce precisely the effect which apparently arose from its use. I say "apparently arose," because, by May of last year, the competition had already been felt, and has affected disastrously the plaintiff's business.

This is not a case in which I need make any characterization of the explanation. I need only say that the combination of these circumstances leads me to one conclusion only, unless I close my eyes and assume a credulity which no sensible man can in the face of those circumstances. I cannot accept the story of the supposed innocence of the defendants, and therefore I hold that the accounting shall go back to the beginning, and that any merchandising under the name "Maropa" shall be taken as a tort against the plaintiff, which falls within the ordinary rules governing these cases. I do not mean to indicate any opinion as to whether the plaintiff will be able to prove any damages, or even how far the use of the word alone will entitle them to all the profits if any. That is a matter which I prefer to leave to the master, after the proof is in.

Decree for an accounting before William Parkin, Esq., from January 1, 1919, with costs.