**AMERICAN ASSOCIATION FOR the ADVANCEMENT OF SCIENCE, Plaintiff,**

v.

**The HEARST CORPORATION, Defendant.**

**Civ. A. No. 79–3185.**

United States District Court, District of Columbia.

April 28, 1980.

Robert X. Perry, Jr., John D. Lane, J. Carter McKaig, J. Michael Cleary, Washington, D. C., for plaintiff.

Arthur J. Greenbaum, New York City, Arthur J. Levine, Washington, D. C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This is an action by the publisher of *Science* magazine for federal and common law trademark infringement and unfair competition under the Lanham Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.* and the common law of the District of Columbia. Plaintiff, the American Association for the Advancement of Science (AAAS), seeks to permanently enjoin the defendant, The Hearst Corporation (Hearst), from publishing a revised edition of its *Science Digest* magazine so as to give the word "Science" in the title undue prominence, thereby allegedly infringing AAAS's trademark rights and constituting a false designation of origin. The claim of money damages is not considered here, as the trial has been bifurcated under Fed.R.Civ.P. 42(b) to allow a more speedy resolution of the main issues. Pursuant to Fed.R.Civ.P. 65(a)(2), the trial of the action on the merits was advanced and consolidated with the hearing on AAAS's motion for a preliminary injunction. Hearst has filed a counterclaim in which it seeks to cancel plaintiff's registration of the trademark "Science" under 15 U.S.C. § 1119, arguing that the word is a generic term for a class of magazines and therefore not protectable by trademark. Upon consideration of the testimony and evidence presented at a five–day trial, and applicable law, the Court finds that AAAS's trademark registration of "Science" is valid, and Hearst's practice of publishing *Science Digest* with the word "Science" given overwhelming prominence is an infringement of AAAS's mark and constitutes unfair competition. Consequently, AAAS is entitled to appropriate injunctive relief.

In 1880, inventor Thomas A. Edison founded a magazine to which he gave the title "Science." It entered, and has remained, in the stream of interstate commerce as a magazine issued weekly concerning the field of science. Alexander Graham Bell subsequently was another famous owner of the magazine. AAAS, a national scientific society incorporated in Massachusetts in 1848 and now having its principal office and place of business in the District of Columbia, adopted the magazine as its official publication in 1900. In 1944, AAAS succeeded to ownership of the magazine.

The trademark "Science" in 1970 was entered on the Principal Register of the United States Patent and Trademark Office in AAAS's name, for a "periodically issued magazine concerning the field of science primarily" with Registration No. 903,034. In 1975, AAAS filed an affidavit, as required by § 8 of the Lanham Act, 15 U.S.C. § 1058, asserting that the mark "Science" was still in continuous use. The registration remains in full force and effect.

AAAS and its predecessors have prominently displayed the trademark on the cover of the magazine every week since its

inception 100 years ago. It has used its present logo (i. e., the form of the title), in which "Science" is presented in large capital letters stretching the width of the cover, atop the page, continuously for the past 21 years. (See Appendix A).

The mark "Science" identifies AAAS's magazine and is descriptive of its contents. Many other magazines have been granted valid trademarks that include forms of the word "science." Of those such magazines introduced in evidence, exclusive of defendant's, all present their titles so that none may reasonably be confused with *Science.*

*Science* is a sophisticated magazine, which caters to and is highly regarded by the scientific community. Its articles typically are written by scientists who are paid nothing for their contributions but consider it an honor to be accepted for publication. Authors of articles in *Science* include 145 Nobel Prize winners who have contributed over 400 articles to this magazine. The magazine is very selective about which articles it will print: it accepts less than 25 percent of the approximately 5000 manuscripts submitted each year. A rigorous reviewing and editing process insures a high level of quality and accuracy. Because of the magazine's concern for accuracy, high priority is given to readers' letters that are critical of articles. *Science* also has an outstanding reputation among journalists, who consider it "prestigious" and a valued source of reliable scientific news. Its reputation for reliability stems in large part from its practice of presenting rounded views, fully recording critical as well as supporting positions.

Befitting its character, the magazine uses color and graphic design conservatively, although it is printed on high quality coated paper and typically wears a cover presenting an attractive, full-color photograph. The advertisements in *Science* offer laboratory equipment, chemical substances for experiments, and little else.

While the magazine is geared toward the world's scientific elite, *Science*'s appeal is by no means limited to this ethereal group. *Science* contains a section (in the back of the magazine) devoted to reports and the like; the text here is highly technical and difficult. Toward the front of the magazine, however, are articles and book reviews which tend to be simpler and are readable by college graduates with no particular scientific expertise. While over half of *Science's* subscribers have Ph.D. degrees, its readership includes students, executives of industrial corporations, and governmental decision makers. Even high school teachers use it as a teaching aid.

The magazine's circulation has exceeded 100,000 copies weekly for the past 16 years and now is greater than 151,000. Some 100 copies are sold weekly at newsstands near various universities and research institutions; the overwhelming majority of copies, however, is sold by subscription. Most of these are sold in combination with membership in AAAS, although non-members also receive subscriptions, including 21,000 libraries representing virtually every college and university in the nation.

The magazine is well known to, and frequently read by many professors; an independent study conducted in 1976 concerning general periodicals, including magazines and newspapers, read by faculty members found *Science* the fourth most popular, after *Time, Newsweek,* and the *New York Times.* Among professors at major universities, the study showed that *Science* had the third greatest readership, after *Time* and the *New York Times,* and before *Newsweek, The New Yorker, New York Review of Books,* and *Saturday Review.*

*Science* is cited in newspaper articles approximately five times a week, and regularly in other publications of general interest. In the twelve month period from May 1978 through April 1979, articles in *Science* were cited in 1,048 stories in newspapers and other nontechnical publications throughout the country. These stories appeared in 412 newspapers, 23 general interest magazines such as *Time* and *Newsweek,* and 53 specialized publications. Very often it is cited in other scientific journals; a study of 3,400 of these found *Science* the seventh most frequently referenced periodical. Indepen-

dent studies conducted by the Institute for Scientific Information in Philadelphia showed that *Science* articles were cited by other scientific journals 47,000 times in 1974 and 59,000 times in 1978. *Science* ranks ninth in sales among 12,500 microfilmed periodicals distributed by the largest microfilm company in the country. In 1979 *Science* received over 7,000 requests to republish material from the magazine in books and other magazines. Hundreds of thousands of reprints of *Science* articles are sold annually.

Each year, AAAS advertises its magazine extensively; from 1976 through 1979 it spent over $1 million for this purpose. In 1979 it sent direct–mail material promoting *Science* to over 1.2 million persons.

In light of the foregoing, it is without doubt that the name "Science" has come to be extremely well known to scientists, academicians, and others involved with scientific matters as the title of a highly respected, authoritative, and scholarly science magazine. By its frequent citation in newspapers and other periodicals, the name also has become similarly associated among intelligent laymen interested in science. Clearly, AAAS's magazine has established for itself among these groups of people a special meaning in the word "Science."

In 1978, AAAS decided to launch a new publication, a sister magazine to *Science* that also would concern the field of science, but be directed toward a broader audience. In the new magazine's words, it would "bridge the distance between science and citizen." Promotional material featuring the magazine, then entitled "Science 79," was distributed by AAAS to approximately 277,000 persons in January 1979. The premier issue of the magazine was published in the first week of October 1979, and carried the title "Science 80." Its circulation is now over 375,000.

*Science 80* is much more colorful than *Science,* employs greater use of large photographs and reveals a more ambitious use of graphics. Its articles are not written by scientists as are those in *Science,* but by professional writers. *Science 80*'s articles are significantly less esoteric than those in its older counterpart: while *Science* will devote a major article to discussing in depth the constitution of genetically different types of protein collagen, *Science 80* will present a sweeping, anecdotal narration of the pitfalls and successes surrounding a "cowboy physicist" through his work in the relatively short history of atomic particle accelerators. The text is printed in larger type than that used in *Science.* The result is a magazine than is visually more attractive and easier to read than *Science.*

Yet in its effort to popularize scientific topics, *Science 80* adheres to *Science*'s tradition of restraint and impartiality in its stories. The articles are more fascinating, but certainly not fantastic. In stories concerning new discoveries, caveats and qualifications abound. *See, e. g.,* Def.Exh. 26, *Science 80,* Jan.–Feb. 1980, at p. 70, ¶¶ 2–3.

While *Science* and *Science 80* are directed at different markets their readerships do blur together. AAAS's witness Ormes estimated that the two magazines may have about 10,000 to 15,000 common subscribers.

*Science Digest* was first published in 1931 and for years has been a small ($5\frac{1}{8}'' \times 7\frac{1}{4}''$) monthly, similar in size to *Reader's Digest* and *T. V. Guide,* presenting stories about the wonders of science. Early issues included articles with such unlikely titles as "Soviets Fight Religion with Chemistry" (1937) and "You'll Be Wearing Milk Clothes" (1941). The title is the subject of trademark protection, carrying Registration No. 513,794. The words "Science" and "Digest" have equal prominence in the logotype in which they appear on the registration form, and while the magazine has displayed its trademark in at least nine different cover logo designs over the years, until 1979 it had always given the words equal prominence. For some time now, *Science Digest* has been owned by Hearst. Hearst is a large and widely known publisher of a variety of periodicals worldwide. Its publications include a number of respected and well–established daily newspapers, as well as a group of 14 magazines including some of the most popular journals in the country.

Over the past years, however, *Science Digest* became the wayward asteroid among Hearst's assortment of rising stars. Since the mid–1960's its circulation had not risen appreciably,[1] and in the past five years advertising had been minimal, causing the magazine financial loss.

Since 1975 Hearst has considered plans to upgrade and modernize the magazine. These plans culminated with the publication of a "special edition" *Science Digest*, the subject of the lawsuit, which first appeared and was sold in interstate commerce (primarily on newsstands) on October 10, 1979. Prior to trial, two issues, each of 257,000 copies, were distributed for public consumption. The third issue was in distribution at conclusion of trial. A fourth is expected to reach the public this summer.

The special edition of *Science Digest* represents a radical departure from the magazine's previous format. *See* Appendix B. It has been enlarged to a standard size, in part in order to facilitate the use of standard advertisement layouts and thereby allow advertisers to reduce their costs. The new *Science Digest*[2] is a slick, attractive package. It is replete with stunning full color photographs of various scientific phenomena. Its overall graphic design is quite contemporary and eye–catching, calling to mind the format of *New West* and *New York* magazines. It is full of exciting, sense-tantalizing, curiosity–piquing stories. The cover of the Winter 1979 issue announces articles on "Sex and Survival—Our Erotic Origins," "Fuel from Water—Science Says Yes," "Plus Urgent News on Radiation, Pain, Cancer, Smoking, Pesticides, Burns." Inside are stories concerning such timely topics as genetic engineering and the discovery of a new galaxy. Some stories recall the old *Science Digest* as far as their implausibility, for example, "Catastrophes: Would Earth Survive?" discusses the

possibility of the earth flipping on its axis or being hit by a city–destroying meteor. Still, even AAAS's expert witness on science writing, Dr. Rae Goodell, acknowledged that the magazine does contain some articles of good quality.

The magazine lists some of its objectives: "to bring science to life," "to stand at the frontiers of science," and "to share in the drama and high excitement of discovering our place in the universe." It is not conservative. It is a flashy, "up–beat" magazine that differs from *Science* as a Philip Roth novel differs from a Shakespeare play, as Bo Derek does from Katherine Hepburn.

Yet the change Hearst made in *Science Digest* that caused the controversy at hand is in the magazine's cover logo. The word "Science" has been enlarged to letters about 1½″ high and stretches the width of the top of the cover, while the word "Digest" has been reduced to type 10.8 times smaller. The two words are, however, printed in the same typeface, have the same color, and are bounded by five, similarly–colored, horizontal rules called "unifying lines" by Hearst. Most of the other words on the cover, which introduce stories and establish a date and price for the magazine are printed in the same typeface as the title. However, none of the other words share the title's tint; all are in white. The title's silver–gray color in the Winter 1979 issue is used nowhere else on the cover except as a background for the obligatory stripes and numbers of the Universal Price Code in the lower left corner.

Many other popular magazines employ logos like Hearst's which give significant emphasis to a particular word or words of the title.

AAAS first complained of the logo of the new, large *Science Digest* by its September 5, 1979 letter to Hearst. Further correspondence between the parties' counsel

---

1. From a low of 141,074 copies in 1965, *Science Digest* reached its zenith circulation of 159,139 in 1970; the 1979 figure of 153,958 reflects its meanderous path.

2. *Science Digest* continues to be published in its traditional, small format, although Hearst expects that this will be replaced entirely by the new, large edition. Subsequent references to *Science Digest* in this opinion indicate the new enlarged version, except where distinguished by the words "old" or "small."

failed to resolve the matter which is now presented for resolution through this litigation.

AAAS's expert witness on the design of magazine covers and logos and human perception thereof, Carl Herrman, testified as to the visual hierarchy of type in the cover of *Science Digest.* Magazine designers and advertisers recognize that whenever there are different visual elements on a page, some are perceived sooner or are given more attention than others; these elements are higher in this hierarchy. "Science" clearly is the dominant word on the cover: because it dwarfs all others, it is the first apprehended. Next, however, is not the word "Digest" but the phrase "Special Edition." This appears in letters which, although marginally shorter than the letters in "Digest," are printed in significantly bolder letters in highly–contrasting white. Next most prominent are the words introducing the key article; in the Spring issue, they are the words "Mind and Body." These are also in bold, white type approximately the same size as "Digest." "Digest" follows thereafter. AAAS's expert testified that the "design works very well," but noted that from a designer's point of view the word "Digest" is lost as far as visual identification.

Hearst's expert, John Peter, testified that because *Science Digest*'s logo was designed as a "unitary title," a consumer approaching a newsstand would perceive the title correctly as "Science Digest." Tr. 368–69. Yet actual viewing of the cover demonstrates otherwise.

The word "Digest" almost disappears when the cover is viewed even from short distances. AAAS's Exhibit 4 is a large poster board on which covers of issues of *Science*, the old, small *Science Digest*, and the new, large *Science Digest* special edition are displayed. The board was placed on an easel, and positioned by counsel for each side at several locations about the courtroom. For most of the trial, however, it remained near the witness stand, a measured 14½ feet from the Court. Although abundantly cognitive of the true title of the magazine and the words which actually existed on the cover, through the five days of trial, and forcefully straining for a more neutralized perspective, the Court nonetheless continually found the word "Digest" blurring into oblivion.

The same effect can be expected on potential newsstand purchasers of *Science Digest,* who obviously would be less inclined to make the same effort to see all details. AAAS sent one of its employees, an amateur photographer, to New York City to photograph various newsstands around the city featuring *Science Digest.* She used a 35 millimeter lens, which approximates the scope of human vision, and used no special filters. Her unimpeached testimony established that all of her photographs that were submitted in evidence accurately represented what she saw and how she saw it, except for one photograph taken in a dark area that required special processing to make its subject visible (Pltf. Exh. 17e). Where "Digest" is not invisible, it is barely legible. In one normally–processed photograph (Pltf. Exh. 17d), the word effectively dissolves into the magazine's cover photo.

It is conceivable that the color gray was selected as the background for the price code on the Winter 1979 issue in order to minimize its intrusion into the cover photo and render it less noticeable. This is precisely what happens to the word "Digest" on the cover. Yet since the relative size of the word "Digest" is so much smaller than that of "Science," even high contrast cannot solve the problem. The illegibility of "Digest" is even more glaring inside the magazine, where the logo is reproduced on the table of contents page and especially on the "message to our readers" card between the cover and page one.

AAAS presented an intelligent, credible witness who actually was confused by the cover logo design of *Science Digest* and perceived its title to be "Science." He had seen a copy of the magazine and wrote a letter to its editor (Pltf. Exh. 18), asking for the "Special Edition of Science." The witness testified that he was familiar with *Science,* having read it for a period of about

six months in 1974, and stated that when he first saw *Science Digest,* believed it to be a special, popularized version of AAAS's magazine.

The unimpeached testimony of AAAS's witnesses and the Court's own observation and judgment make it abundantly clear that the title of defendant's magazine will likely be perceived by an appreciable number of people to be "Science." *Science Digest* is especially susceptible to being mistaken for something it is not since it is sold on newsstands. It is recognized by the magazine trade that newsstand magazines are not infrequently purchased on impulse; as the magazines involved here are relatively inexpensive, careful comparison shopping is not the significant factor it is in the purchase of durable goods. Hearst stresses, and AAAS must concede that the purchasers of *Science Digest* are also an intelligent group, the magazine being designed for "the intelligent layman interested in science." Yet intelligence insures neither accurate perception nor care in purchasing. In fact, intelligent, wealthier consumers might be prone to do more impulse magazine buying than others, the one or two dollar price being a less important factor in their consideration.

The markets of *Science* and *Science Digest* at some point overlap, and it is clearly evident that a number of potential buyers would be drawn to both magazines. As both are magazines primarily concerning the field of science, they are sufficiently related that someone who misperceives or misunderstands the title of *Science Digest* most probably would associate it, erroneously, with *Science.*

Hearst maintains that it intended "Digest" to be visible, in order to capitalize on the goodwill established among readers of small *Science Digest.* However, its witnesses have testified that because of a desire to emphasize that the magazine concerns science and a lack of room on the cover, it was Hearst's "creative judgment" that the words would appear in the proportions that they do. (Tr., vol. III, p. 121). Here then, Hearst's artistic discretion suc-

ceeded in minimizing its avowed intent to assure continued association with "Digest." Moreover, most of Hearst's other magazines with multi-word titles do accord equal prominence to each word. *See, e. g.,* Pltf. Exh. 62 (cover to *Sports Afield* magazine).

The present logo for large *Science Digest* was designed by Frank Rothmann, an art director employed by Hearst. On January 4, 1979, he met with Gilbert C. Maurer, president of the Hearst Magazines division and Daniel Button, editor of small *Science Digest,* to discuss the graphics of the revised edition of the magazine. At this meeting, Maurer asked Rothmann to redesign the logo. On January 26, Rothmann presented Maurer with four mock-ups or "comprehensives" of proposed covers. In each comprehensive, "Science" is substantially larger than "Digest." Maurer and Rothmann agreed that they both liked one better than the others; its logo design ultimately was used on the new magazine.

Hearst's witnesses testified that no memoranda of either meeting exist or were taken, even though the occasion reflected the most dramatic change in the magazine's cover (involving size, logo, graphics, color, photographs) in approximately 50 years.

No trademark search was conducted even though the logo was to be altered substantially.

In 1975 some unrecalled artist made two comprehensives for a revised *Science Digest*; in each of these "Science" was displayed substantially larger than "Digest." Rothmann testified that not until this litigation commenced did he see those earlier comprehensives. He attributed the similar treatment among his four and the two 1975 designs to "coincidence." (Tr., vol. V, p. 499).

Several of Hearst's key employees in the development of *Science Digest* were aware of AAAS's magazine and its reputation. The parties have stipulated that brochures introducing *Science 79* and *Science 80* were found by AAAS's counsel in defendant's files. Special Edition *Science Digest* editor De Garmo testified that he was familiar with *Science* magazine at the time the cov-

er logo was selected. (Tr., vol. IV, p. 422). Daniel Button, editor of small *Science Digest*, was also familiar with AAAS's reputation and that of *Science*.

Button even sent several memoranda to Maurer concerning AAAS, *Science* and its plans for *Science 80* between November 1978 and February 1979. (Pltf. Exh. 28, 29; Def. Exh. 10a) (Tr., vol. III, pp. 132–39). In the third, received in February 1979, Button discussed *Science* magazine and noted that there was a "copy attached" to the memo. (Tr., vol. III, p. 138). Yet Maurer testified that he did not recall reading any of these memoranda or seeing the copy of *Science*. Between the date of those documents and July 4, 1979, the date on which, he testified, he first became aware of *Science* and AAAS, three additional memoranda mentioning them were sent to him. He denied reading them as well.

It is highly implausible that a man who had assumed full and personal control over the revitalization of a stagnant magazine, the single disappointment of a flourishing empire, would fail to read six memoranda concerning such an important development as the plans of a prestigious scientific organization to introduce a potentially competitive magazine. The Court is not convinced that Mr. Maurer, a forceful executive and member of the Hearst Corporation's board of directors, would have failed further even to suggest ideas and provide guidance to his art director who testified that he blazed the new trail on his own without any directional scope.

Whether Maurer did or did not know of plaintiff's publications or reputation, whether he did or did not read any or all of the above key memoranda or simply has a total deficit of memory as to this entire matter (and little credence can be given his overall testimony), the fact remains that Hearst Corporation employees instrumental in the development of *Science Digest* possessed such knowledge at the time the logo was being redesigned. From late 1978 through 1979, 17 separate memoranda and other items concerning AAAS and *Science 80* circulated in Hearst's magazine division. (Pltf. Exh. 28–43, Def. Exh. 10a).

AAAS does not contend that the typeface of the logo of special edition *Science Digest* is in and of itself improper, and it acknowledges that there is no likelihood of confusion between the titles "Science" and "Science Digest," provided the latter appears as a unitary title in the same size and style print. It must also concede that *Science* for the last 30 years has been identifiable as an AAAS publication, by the prominent presence of the association's name on the cover.

Still in any case, even a discriminating reader of *Science* could, at first blush, mistake large *Science Digest* for a new publication by AAAS. A casual reader of *Science* is even more likely to be confused as to the source of *Science Digest*.

Any incorrect association of *Science Digest* with AAAS would harm or at best distort the reputation of the scholarly organization. *Science Digest* by no means must conform to plaintiff's standards of restraint and conservatism, and under the tenets of a free press neither can nor should be compelled to do so. Yet because it does not, any association of *Science Digest* with AAAS would disturb the reputation for accuracy, caution, and impartiality that AAAS has achieved over the years.

It is more likely than not that AAAS will lose sales to defendant as a result of a consumer's misperception of Hearst's logo, although one can only speculate as to the volume of sales that would be diverted in the future. A person who is only familiar with *Science* through the frequent references to it in newspapers or other magazines might readily perceive a newsstand copy of *Science Digest* as AAAS's magazine and purchase it thinking he has found this oft-quoted journal. Although no one can be certain to what extent *Science*'s sales would suffer as a result, certainly this harm in time can only multiply as Hearst's magazine begins to increase its presence and establish itself well in the marketplace.

Finally, consumer misperception of *Science Digest* as a magazine coming from the same source as *Science* undoubtedly would depreciate the utility of AAAS's mark on

related goods. It is not unusual for a company to introduce new products into the marketplace under names that are the same as or subtle variants of the name of one of its well–known, well–established products. The effect of this is to allow the company's new product to share in the good will it has fostered among buyers over the years with respect to the older product. The new product's mark thereby instantly announces to the public the origin of the product and informs buyers that the qualities they have grown to favor in the company's older product might also be found in the new entry. AAAS already has begun publishing a new, sister magazine to *Science*, which is intended for essentially the same market as that for which the revitalized *Science Digest* is directed. AAAS developed its new magazine with *Science*'s tradition of accuracy and reliability always in mind. Quite naturally, AAAS named its new magazine in such a way as to make the public aware that it would conform to *Science*'s rigorous standards; to link it with the well–established weekly. That linkage would be severed if another magazine equally could be perceived as originating with AAAS, which precisely is the case here.

While AAAS has clearly suffered and will continue to suffer harm to its magazine publishing ventures as a result of Hearst's actions, the Court may grant relief only if the elements of trademark infringement or unfair competition under the law are satisfied.

### I. *Trademark Infringement*

■ To establish trademark infringement under 15 U.S.C. § 1114, AAAS must establish that Hearst used in commerce a reproduction or colorable imitation of its registered trademark in a manner likely to cause confusion, to cause mistake, or to deceive. If AAAS proves infringement, its remedies are limited to an injunction against future infringement unless Hearst's acts were committed with knowledge of intent to cause confusion, mistake or deception, in which case AAAS is entitled to recover profits or damages. This trial has been bifurcated as to the claim for damages; the issue of intent to confuse, although relevant, is not now of essential concern in resolving the matter at hand.

### A. Validity of Plaintiff's Trademark

■ AAAS has produced a certificate showing the registration of "Science" on the Principal Register of Trademarks; this is *prima facie* evidence of the registration's validity and of AAAS's right to use the mark for, as the certificate states, "a periodically issued magazine concerning the field of science primarily." Pltf. Exh. 6; 15 U.S.C. § 1057(b). It is also *prima facie* evidence that AAAS's mark is distinctive of its products in commerce. *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 161 (1st Cir. 1977). Since AAAS has used the mark "Science" continuously for five years after it was registered in 1970, its right to use the mark is incontestable. 15 U.S.C. § 1065. However, Hearst may attack, and has attacked, the mark's validity by way of counterclaim for cancellation of registration under 15 U.S.C. § 1119. *Dymo Industries, Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964).

■ Whether a mark may be given trademark protection depends upon its distinctiveness. Fanciful marks (those coined for the purpose of service as trademarks, such as "Exxon"), arbitrary marks (real words that do not describe or suggest the products to which they are attached, such as "Camel" for cigarettes), and suggestive marks (which call to mind a feature of the products, such as "Playboy", a mark that suggests the lifestyle presumably sought by that magazine's readers), all are inherently distinctive and receive legal protection immediately upon adoption and use. *See, e. g., Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 700 (2d Cir. 1961); 1 J. McCarthy, *Trademarks and Unfair Competition* § 11:2 (1973). On the other hand, generic terms, such as "aspirin" or "cola" cannot be trademarks, since they name a substance or a class of goods. *Bayer Co. v. United Drug Co.*, 272 F. 505 (S.D.N.Y.1921) (L. Hand, J.) In between are descriptive marks, personal names, and quality designa-

tions, marks which describe aspects of the product.

■ Prior to the enactment of the Lanham Act in 1946, descriptive terms could not be the subject of trademark protection. Now such marks are given protection where the mark has a secondary meaning; that is, where the relevant class of consumers has come to associate the mark with a specific seller or source, however anonymous. *See, e. g., Blisscraft, supra; Travel Magazine, Inc. v. Travel Digest, Inc.,* 191 F.Supp. 830 (S.D.N.Y.1961). Before 1946, however, users of descriptive marks with secondary meanings could protect their marks under unfair competition law. *See, e. g., Magazine Publishers, Inc. v. Ziff–Davis Publishing Co.,* 147 F.2d 182 (2d Cir. 1945); *McGraw–Hill Publishing Co. v. American Aviation Association,* 117 F.2d 293 (D.C.Cir. 1940).

1. Genericness of Plaintiff's Mark

■ Hearst argues that AAAS's mark "Science" is a generic term, not entitled to protection and therefore improperly registered.[3] It has attempted to show that there is a class of goods called science magazines, and that "science" is the generic name for this class. Hearst's argument is unpersuasive. While it has brought forth numerous magazines that in some manner deal with science, it has not demonstrated that these form a definite class. It simply has asserted that there are classes of magazines called science–fiction magazines, business magazines, sport magazines,[4] and the like, and on this basis would have the Court conclude that accordingly, the term science as applied to science magazines is generic. Its list of apparent candidates for a supposed class of science magazines includes publications with such diverse sounding titles as "Science Citation Index," "Compost Science/Land Utilization," "Tire Science & Technology," "Photographic Science & En-

gineering," to name a few. The only commonality among these publications would appear to be that their titles all include the word "science." Indeed, any attempt at finding a class of science magazines must result in an amorphous compilation. Dr. Rae Goodell (the expert in the field of science journalism) noted that any of the following publications either could or could not be considered science magazines: *Omni,* which contains science fiction; *Psychology Today,* which concerns popular psychology; *Technology Review,* which is the Massachusetts Institute of Technology's alumni magazine, among others.

In science journalism reference to a "class of science magazines" is meaningless without qualification and specificity. The audience and the precisely described subject matter determine the magazine categories. When used in the abstract, in and of itself, without a contextual frame of reference, the phrase "science magazine" is rudderless. Those solitary words do not describe a class or reasonably identifiable category. AAAS's registered trademark, it must be remembered, is not "Science magazine." It is *"Science."* "Everyday experience tells us that if a person is asked what the word 'science' means to him or her, the response will *not* be 'a class of magazines,'" Plaintiff's Reply Brief, at 14.

Yet even if there were some definite class of science magazines, it does not follow that AAAS's mark is a generic term for that class. Plaintiff's mark is "science," but neither its product nor any class of magazines constitute science. "Science" refers to bodies of knowledge. The product is "magazine." Simply characterized, plaintiff's mark is not generic, but descriptive.

Relevant case law abundantly supports this conclusion. The courts almost uniformly find magazine titles as descriptive rather than generic, and therefore protectable

---

3. The Lanham Act provides that "common descriptive" marks are not registrable. 15 U.S.C. §§ 1064(c), 1065(4). The courts instead use the term "generic" to explain this idea, so as to avoid confusion with the class of protectable marks called "descriptive."

4. The word "sport" as the title of a magazine is not generic but descriptive, a New York court has held. *Macfadden Publications, Inc. v. Time, Inc.,* 110 U.S.P.Q. 144 (N.Y.Sup.1956).

upon proof of secondary meaning. Some of these include "Alaska," "Aviation," "Sport," "Time," "Travel." *Alaska Northwest Publishing Co. v. A. T. Publishing Co.*, 319 F.Supp. 963 (D.Alaska 1970), *rev'd on other grounds* 458 F.2d 387 (9th Cir. 1972); *McGraw–Hill Publishing Co. v. American Aviation Association, supra; Macfadden Publications, Inc. v. Time, Inc.*, 110 U.S.P.Q. 144 (N.Y.Sup.1956); *Time, Inc. v. T. I. M. E., Inc.*, 123 F.Supp. 446 (S.D.Cal.1954); *Travel Magazine, Inc. v. Travel Digest, Inc., supra.* Even the word "News" in the title of a newspaper was held descriptive. *Belleville News–Democrat, Inc. v. St. Clair County Publishers, Inc.*, 26 Ill.App.2d 95, 167 N.E.2d 573 (1960). Moreover, Hearst itself holds registered trademarks for the titles of *Motor* and *Motor Boating & Sailing* magazine, which clearly are no more descriptive than "Science."

Defendant relies heavily on a recent Second Circuit decision in which that court held the name "Consumer Electronics Monthly" generic of a class of magazines dealing with a particular trade or industry. *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11 (2d Cir. 1975). That decision is inapplicable to the facts of the instant case. There, the *CES* court found that it would be difficult for *trade* magazines in the consumer electronics industry to identify themselves if one publisher were granted a monopoly in the trade's name. That case was atypical of cases involving magazine titles in that there did exist a readily ascertainable class of trade magazines dealing with consumer electronics, for which no title probably could suffice but one that used the name of the industry itself. Here, as noted above, there is no definite class of science magazines. Given the vast number of magazines which hold registered trademarks in titles employing the word "science" in numerous forms and existing in harmony with *Science*, the policy consideration of avoiding a monopoly is absent here. Moreover, to deny protection to AAAS's mark would contravene the equally strong policy consideration of insuring that a manufacturer may identify his product so as to distinguish it from others in the mar-ketplace and thereby avoid public confusion.

The court in *CES* in fact distinguished the case of non–trade magazines, such as *Science*, noting that

> * * * Courts have been reluctant to find a magazine title generic, perhaps in part because the magazines in such cases were not literally the class the title designated but were *about* that class . . . . .

531 F.2d at 14 (emphasis in original).

It cannot seriously be questioned that AAAS's product is not literally "science" but is *about* science. As such, it is undeniable that AAAS's mark is not generic but descriptive and therefore protectable upon a showing of secondary meaning.

### 2. Secondary Meaning

■ "Secondary meaning" means an association in the minds of the buying public between the name of the product and the product itself or its source. *Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970), *Blake Publishing Corp. v. O'Quinn Studios, Inc.*, 202 U.S.P.Q. 848 (S.D.N.Y.1979). As such, it bestows upon an initially descriptive title the distinctiveness which trademark protection requires. 15 U.S.C. § 1052(f); *Travel Magazine, Inc. v. Travel Digest, Inc., supra*, 151 F.Supp. at 833.

■ A mark's registration on the Principal Register is *prima facie* evidence of the fact of its having acquired secondary meaning. *Norsan Products, Inc. v. R. F. Schuele Corp.*, 286 F.Supp. 12, 14 (E.D.Wis.1968). Since one ground for refusal of registration under 15 U.S.C. § 1052(e) is that a mark is merely descriptive or "weak," the fact of registration is *prima facie* evidence that a mark is sufficiently distinctive to warrant trademark protection and eliminates the need to prove secondary meaning. *American Home Products Corp. v. Johnson Chemical Co., Inc.*, 589 F.2d 103, 106–07 (2d Cir. 1978).

■ Clearly, Hearst has not sufficiently challenged AAAS on the issue of secondary meaning, having limited its strongest arguments to the issues of genericness and likelihood of confusion. Summing its argument: *Science* has not achieved secondary meaning because the general public is not familiar with the magazine or plaintiff. But Hearst's point of inquiry is wrong. The question is not whether the general public, but the *relevant buyer class* associates a name with a product or its source. 1 McCarthy, *supra*, § 15:11, at 540–41. The general public need not be familiar with, nor even aware, of the existence of the product. The California Supreme Court upheld a finding of secondary meaning in the title of a play in an action to enjoin use of that title in a movie even though the play ran for only two weeks in Philadelphia, closed after seven weeks in New York, and was not performed anywhere for two years before the defendant's film was released in Los Angeles. Despite the fact that the play had only modest publicity in the three cities, received unfavorable reviews, and was seen by only 3750 theatergoers, the court held that the play's publicity in the dramatic trade was sufficient to demonstrate that the play had established a *nationwide* secondary meaning for the play's title. *Jackson v. Universal International Pictures, Inc.*, 36 Cal.2d 116, 222 P.2d 433, 437 (1950). Similarly, a showing that few people disinterested in science or outside of scientific circles are aware of *Science* is not fatal to finding secondary meaning.

Hearst correctly notes that a proliferation of magazines with titles employing the word "aviation" as a dominant and descriptive part of their titles was an important factor leading the Court of Appeals for this Circuit to conclude that there was no secondary meaning for the title of *Aviation* magazine. *McGraw–Hill Publishing Co., supra*, 117 F.2d at 296. Yet in that case the court was only dealing with secondary meaning with respect to an allegation of unfair competition, having determined under pre–Lanham Act law that "Aviation," being descriptive, was not entitled to trademark protection in any case. Moreover, the court did not hold that as a matter of law there could be no secondary meaning when numerous other magazines used "aviation" in their titles. The magazine *Aviation* did not have the long history and the singular reputation that give *Science* its special identity among magazines. Defendant's argument serves to militate *against* defendant in that it tends to show that plaintiff's exclusive rights in the title "Science" have not excluded other magazines from using forms of the word to identify themselves.

■ Since the existence of secondary meaning is a factual question, there can be no abstract test, quantitative or qualitative, to determine what level of consumer association is sufficient. The courts have, however, considered these factors relevant on this question: (1) the duration and continuity of use of the mark, (2) the extent of advertising and promotion and amount of money spent thereon, (3) figures showing sales of plaintiff's product or number of people who have viewed it, and (4) identification of plaintiff's and defendant's respective markets. *Cowles Magazines and Broadcasting, Inc. v. Elysium, Inc.*, 255 Cal. App.2d 731, 63 Cal.Rptr. 507 (1967); 3 Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 77.3 (1969).

While Hearst has proffered minimal evidence on the subject, AAAS has gone far beyond its burden, producing substantial evidence of *Science*'s secondary meaning.

Persuasive, uncontroverted, and unimpeached evidence has been established as to all of the four enumerated factors. As earlier noted, AAAS has used the mark continuously for almost 100 years. Over one million people received promotional materials from *Science* in 1979. The magazine is often cited in other journal works and has a well–established reputation for high quality. Indeed, critical acclaim was held important evidence of secondary meaning: "A highly praised work is more likely than not to be known by name." *Field Enterprises Education Corp. v. Cove Industries, Inc.*, 297 F.Supp. 989, 995 (E.D.N.Y.1969). Finally, it is evident that the magazines have

similar, although not identical, markets. On the basis of the foregoing, it is abundantly clear that *Science* has acquired a secondary meaning for its title.

B. Likelihood of Confusion

The commercial use of a "colorable imitation of a registered mark" that is "likely to cause confusion" constitutes trademark infringement. 15 U.S.C. § 1114. As AAAS has proven that its mark "Science" is duly registered and therefore deserves protection under the trademark law, all that remains with respect to the allegation of infringement is to find a likelihood of confusion between its and Hearst's marks.

The crucial focus of inquiry on the issue of likelihood of confusion is the effect of defendant's mark on prospective purchasers. *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1134 (2d Cir. 1979). If the new *Science Digest* logo is likely to have the effect of confusing purchasers into believing that Hearst's magazine is somehow associated with AAAS or *Science* ("source" confusion), or if it would tend to cause purchasers to mistake the magazine for *Science* itself ("mistake" confusion), the requirements for finding this element of infringement are satisfied. While AAAS must show that an "appreciable" number of reasonable buyers is likely to be confused, this does not necessarily mean a majority. *James Burrough, Ltd. v. Lesher*, 309 F.Supp. 1154, 1159 (S.D.Ind. 1969) (that 37 of 300 polled customers indicated that defendant's mark suggested to them plaintiff's product was sufficient). Neither is it necessary to show actual confusion, such evidence being difficult to find, although evidence of actual confusion is substantial proof of the fact of likelihood of confusion. *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 572 F.2d 574, 578 (7th Cir. 1978); *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 611–12 (7th Cir. 1965). Identical resemblance of the two marks is not essential to a showing of likelihood of confusion. *Saxlehner v. Eisner*, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900); 3 Callmann, *supra*, § 80. Aptly put, the test is

"not whether people will confuse the marks but whether the marks will confuse people." *Application of West Point–Pepperell, Inc.*, 468 F.2d 200, 201 (Cust. & Pat.App.1972).

AAAS's witness, Arthur Habel, vividly and persuasively testified that he was confused by the new *Science Digest* logo, mistaking the magazine for *Science*, and acting in reliance on that confusion. He believed that the magazine he had examined twice in his friend's office and later in his home was indeed a special edition of *Science* magazine, of which he had become familiar several years before.

The circumstances under which Habel was located by AAAS's counsel serve to add great credibility and weight to his testimony. Counsel for AAAS found in Hearst's files, through the discovery process, the letter Habel sent Hearst (Pltf. Exh. 18) asking for a copy of the "Special Edition of Science." Upon counsel's request, Habel came forth to testify as to his confusion.

Hearst argues that Habel's testimony is irrelevant, on the ground that had he encountered the magazine at a newsstand he immediately would have perceived the "unitary title" "Science Digest" and understood that the magazine and AAAS had no connection. This argument is specious; clearly Habel was in a position as good or better than that of a newsstand purchaser to perceive the title of the magazine.

Hearst quite correctly notes that one instance of actual confusion is not always sufficient to prove likelihood of confusion. Yet

\* \* \* [t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion. Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.

*World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971). The testimony of the witness, especially in light of the manner in which he

came to AAAS's attention, is highly persuasive, and corroborates the other evidence presented by the plaintiff on this issue.

■ Aside from evidence of actual confusion, criteria toward finding likelihood of confusion include: (1) the degree of similarity between the marks in their appearance, sound, and meaning, (2) how the products are related in the marketplace, or, their competitiveness, (3) the degree of care purchasers are likely to exercise, and (4) the defendant's intent in adopting his mark. *See generally Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.,* 560 F.2d 1325, 1330 (7th Cir. 1977), *cert. denied* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978); *Restatement of Torts* § 729 (1938);[5] 3 Callmann, *supra,* §§ 82.1–82.2.

## 1. Degree of Similarity Between the Marks

■ The marks must be compared not by examining in minute detail their differences, but by viewing them in their entireties, to capture the general impression that they would give a consumer. *See, e. g., La Touraine Coffee Co. v. Lorraine Coffee Co.,* 157 F.2d 115, 117 (2d Cir. 1946): *Guggenheim v. Cantrell & Cochrane, Ltd.,* 10 F.2d 895, 896 (D.C.Cir.1926). Moreover, although the marks may have minor differences, confusion may be likely if the *dominant* portion of both marks is the same. For example, "Listogen" was found likely to be confused with "Listerene" since the first syllable was the dominant part of plaintiff's mark. *Lambert Pharmacal Co. v. Bolton Chemical Corp.,* 219 F. 325 (S.D.N.Y.1915) (L. Hand, J.).

■ With regard to the "mistake" form of confusion, the proper inquiry is not whether a reasonable consumer could distinguish the two magazines when they are displayed side to side, but whether having become aware of one of the magazines on one occasion, he will be able to recognize the difference if presented with the other at a later date.[6] *American Home Products Corp., supra,* 589 F.2d at 107 (2d Cir. 1978) ("Roach Inn" for insect trap likely to be confused with "Roach Motel" for same type product).

After considering the appearance of the logos and their meaning, in accordance with these historically used standards, it is obvious that a purchaser upon viewing *Science Digest's* cover is likely to be confused as to its source, if not mistake it for *Science.* It is undeniable that the word "Digest" appears on the cover of Hearst's magazine and is part of its official title. Moreover, it is probably necessary, as Hearst argues, that a person who would purchase *Science Digest* have eyesight sufficiently strong to read the print of the text inside, which is indeed, much smaller than the type used for "Digest" on the cover. Yet "[l]ikelihood of confusion occurs upon observance of the mark and goods. It need not await a reading of the book." *Dan Robbins & Associates, Inc. v. Questor Corp.,* 599 F.2d 1009, 1013 (Cust. & Pat.App.1979). One expects to have to look closely, or to don eyeglasses if need be, to read text. But he does not have to do so simply to choose a product from a shelf.

## 2. The Magazines' Relationship in the Marketplace

Hearst argues that likelihood of confusion is minimal because the magazines do not appeal to the same audience, that is, they are not in competition. Even if it were true that the magazines shared no

---

5. *The Restatement of Torts, Second,* does not have a corresponding section to § 729, as a result of the American Law Institute's position that the fields of unfair competition and trade regulation have evolved into bodies of law in their own right, no longer dependent upon tort law. The *Restatement* test, or variations thereof, continues to be followed by courts and remains appropriate for our purpose here. *See,*

e. g., *Chips 'N Twigs, Inc. v. Chip–Chip, Ltd.,* 414 F.Supp. 1003, 1013 (E.D.Pa.1976); *James Burrough, Ltd. v. Lesher, supra,* 309 F.Supp. at 1159.

6. This test quite accurately simulates the circumstances under which AAAS's witness Habel actually did mistake *Science Digest* for *Science.*

**260**

commonality of readership, since both primarily concern science, confusion as to source certainly would remain a problem.

 Recognizing this, the courts have established the "related goods" doctrine, under which a mark retains protection against use on any products which buyers reasonably might think could emanate from or have some association with the same source as the markholder's goods. This is also known as the "Aunt Jemima" rule, for the decision protecting that mark on the plaintiff's pancake batter from use on the defendant's pancake syrup resulted long before the Aunt Jemima company had entered the syrup business. *Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407 (2d Cir. 1917), *cert. denied* 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1918). Over the years, such goods as flashlights and locks have been considered "related" for the purpose of trademark protection by the courts, as well as mechanical pencils and razor blades; grocery stores and real estate agencies; pipe tobacco and scotch whiskey; women's apparel and women's toiletries. *See Scarves by Vera, Inc. v. Todo Imports, Ltd. (Inc.)*, 544 F.2d 1167, 1173 (2d Cir. 1976) and cases cited therein at 1172.

Clearly, if goods such as these are considered related, two magazines devoted to new developments in science, one intended for laymen and the other for the learned, must fall within the penumbra of the related goods rule. Even then, if *Science* and *Science Digest* were in no way competitive, which is not the case, this would not bar protecting the former's mark against use on popular science magazines like the latter.[7]

"The trademark laws protect . . . the senior user's interest in being able to enter a related field at some future time." *Scarves by Vera, Inc., supra* at 1172. This concern most certainly embraces the situation of AAAS's new magazine *Science 80*. It is natural that AAAS would want buyers to associate its new magazine with its scholarly journal. *Science 80* and *Science Digest* are without doubt direct competitors. This is further evidence that consumers reasonably could believe that *Science Digest* is associated somehow with AAAS, and more reason to protect *Science* against infringement by *Science Digest*.

### 3. Degree of Care Taken by Purchasers

However intelligent or sophisticated the readers of *Science* and *Science Digest* might be, Hearst has not shown that such people are immune from impulse buying. *Science Digest* obviously is not an expensive item which a purchaser would be expected to examine minutely before buying. Experts for both AAAS and Hearst testified (although Hearst's expert reversed himself later) that impulse buying is a factor in newsstand sales. (Tr. vol. III pp. 57–59; vol. IV p. 350). The court in *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414 (S.D.N.Y. 1980) noted that newsstand sales "consist essentially of impulse buying." *Id.* at 427. As *Science Digest* is largely sold on newsstands, buyers are likely to be impulsive and casual in purchasing the magazine. As a result, it becomes more likely than not that a consumer would be confused as to *Science Digest*'s source or mistake it for *Science*.

### 4. Hearst's Intent in Adopting Its New Logo

 An alternative, although unnecessary, means of showing likelihood of confusion is by the presumption that proof of wrongful intent on the part of the defendant raises. *Playboy Enterprises v. Chuckleberry, supra*, at 425, citing *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir.), *cert. denied* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963).

There is no doubt that some actions of the defendant, collectively considered, are

---

**7.** Indeed, AAAS's registration indicates on its face that it is for a "magazine concerning the field of science primarily." Undeniably, this describes *Science Digest* as well.

suggestive of deliberate infringement: Hearst embarked upon a plan to triple the circulation of the new *Science Digest* over the small *Science Digest* and to "reposition" its magazine to incite appeal to a more sophisticated audience. It did not conduct a trademark search. Although notified that AAAS considered its acts as infringement, Hearst refused on request to provide a copy of its new cover, despite the national distribution of the magazine awaiting public sale the very next day, or to stay its venture into the sales coliseum. In Hearst's selection for the title of its revised publication a logo visually almost identical to "Science" with "Digest" virtually obfuscated and therefore falling from sight and mind, there is the suggestion, but just that, of an intent to capitalize deliberately on *Science*'s enviable good will, prestigious reputation, and alluring market. While individual Hearst employees involved in the redevelopment of *Science Digest* were aware of AAAS and its magazine (and credibility of some of the principals has been tautly strained), AAAS has not been able to establish sufficiently the proximate nexus between these persons and those who caused the logo to be revised. The Court cannot then conclude that Hearst proceeded to its sweeping revisions in a series of bad faith acts promoted by intent to infringe.

■■■ It is well settled in trademark law, nonetheless, that a newcomer (which Hearst essentially was when it so radically revamped its magazine) has a duty to mark his product so as to avoid confusion with existing products of the same genre. *Blake Publishing Corp., supra,* 202 U.S.P.Q. at 858–59, citing *Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.,* 281 F.2d 755, 126 U.S.P.Q. 310 (2d Cir. 1960). While it might otherwise have been unnecessary for Hearst to perform a trademark search, as it continued to use its own trademark of many years as the ostensible title of the magazine, those who ordered the logo re-drawn were duty–bound to make certain that the logo's new form would imitate no existing mark.

"It is 'stretching credulity beyond its breaking point' to suppose that a defendant would not have familiarized himself with the brands and names under which his competitor does business." 3 Callmann, supra, § 82.2(b)(1), quoting *Ramopa Co. v. A. Gastun Co.,* 278 F. 557, 558 (S.D.N.Y.1922). At the minimum, Hearst was careless, and carelessness is a factor weighing in favor of granting relief to AAAS. *Chips 'N Twigs, Inc. v. Chip–Chip, Ltd.,* 414 F.Supp. 1003, 1015 (E.D.Pa.1976).

Without doubt Hearst's new version of *Science Digest* is likely to be confused with, and therefore infringes, AAAS's valid trademark "Science." Consequently, AAAS is entitled to appropriate injunctive relief as specified in 15 U.S.C. § 1114.

## II. *Unfair Competition*

The Court has determined that AAAS's trademark "Science" has been infringed, and consequently that AAAS is entitled to the injunctive relief it seeks. AAAS also has alleged unfair competition under 15 U.S.C. § 1125(a) as a cause of action in its complaint as an alternate basis for relief, which the Court now considers.

■■■ "It is a familiar axiom that the law of trademarks is only a part of the broader law of unfair competition." 3 Callmann, supra, § 67.1. As such, the two bodies of law share the objective of protecting the right of a seller to identify his product in the marketplace particularly, so that customers may distinguish it from other products. The two fields differ, however, in their means of advancing this policy in that while trademark law forbids the use of another person's government–granted monopoly in a name, unfair competition attacks diversion of trade by misleading presentation of a product. Specifically, a valid trademark is not a prerequisite to an unfair competition action.

■■■ The section of the Lanham Act dealing with unfair competition imposes civil liability on anyone who gives his prod-

uct a "false designation of origin" or marks it with "words or other symbols tending falsely to describe or represent the same." 15 U.S.C. § 1125(a). Likelihood of consumer confusion, therefore, is an element of unfair competition. *See, e. g., National Lampoon, Inc. v. American Broadcasting Cos., Inc.,* 376 F.Supp. 733, 746 (S.D.N.Y. 1974); *Blake Publishing Corp., supra.*

While no valid trademark is required to sustain a cause of action for unfair competition, there must be some association, or "quasi–secondary meaning" in the minds of the buying class between plaintiff's product and its source. *See, e. g., McGraw–Hill Publishing Co., supra; Cowles Magazines and Broadcasting, supra.*

Finally, it is not essential that the alleged unfair competitor be engaged in actual market competition with the plaintiff. *National Lampoon, supra.*

Where, as here, the AAAS's mark is not inherently distinctive, the essential elements are the same for either a trademark infringement or unfair competition action. *John Walker & Sons, Ltd. v. Bethea,* 305 F.Supp. 1302, 1309 (D.S.C.1969). Moreover, the remedy for unfair competition, injunctive relief, is the same as that provided by the infringement law. As the Court has found a clear case of trademark infringement, it becomes redundant to explore further whether Hearst's actions also constitute unfair competition under either federal statutory unfair competition law, § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), or the common law of the District of Columbia.

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

As there is no adequate remedy at law for Hearst's continuing infringement of AAAS's mark, AAAS is entitled to a permanent injunction restraining Hearst from publishing *Science Digest* so as to give the word "Science" undue prominence in the title.

For many years it served the purposes of the publisher of *Science Digest* sufficiently to present its magazine with both words on equal footing. Now as the magazine is being revised to attract a larger and different market, Hearst has decided that a redesigned logo is a necessary part of the change.

The Court recognizes the necessity for artistic freedom and the privilege of a publisher to design its product in a manner that he feels appropriate to the message he wishes to convey to the market he seeks to attract. Moreover, the Court is aware that it is not a function of its responsibility to redesign a magazine's cover. Yet superseding this, AAAS has the absolute right not to have its mark "Science" infringed by Hearst. While Hearst may desire to draw a buyer's attention to the subject matter of its revised magazine by emphasizing the word "Science," it cannot be allowed to do so at AAAS's expense.

To prevent irreparable harm to AAAS by the dilution of the distinctiveness of its trademark, the loss of control over its unblemished reputation for quality and the diminishment of its goodwill, Hearst must be enjoined from publishing its magazine with the word "Science" displayed to such predominance that the viewer is magnetized into perceiving it as the title. While Hearst fundamentally is entitled to some liberty in designing its logo, it no longer can be unbridled in this regard. Certainly, to require that Hearst present both words of its title in equal size would be fair to AAAS but overly burdensome to Hearst. In consideration of all factors, it appears abundantly reasonable to the Court that Hearst be restrained from displaying the word "Digest" in letters occupying less than 75% of the area occupied by "Science." This will serve to diminish any kind of confusion and yet allow Hearst some artistic license.

An appropriate permanent injunction and order of this date accompanies this memorandum opinion.

APPENDIX A

5 October 1979 • Vol. 206 • No. 4414 $1.50

# SCIENCE

**AMERICAN ASSOCIATION FOR THE ADVANCEMENT OF SCIENCE**

Cover of Plaintiff's Magazine

APPENDIX B

Cover of Defendant's Magazine

## PERMANENT INJUNCTION AND ORDER

Consistent with the findings of fact and conclusions of law embodied in the Memorandum Opinion of this date, it is, by the Court, this 28th day of April, 1980,

ORDERED that defendant The Hearst Corporation be and hereby is restrained and enjoined permanently from

1. Publishing its magazine *Science Digest* with undue prominence given to the word "Science" or with the word "Digest" occupying less than seventy–five (75) percent of the area occupied by the word "Science" on the cover of the magazine or anywhere else that the title is presented or displayed, and from

2. Publishing a magazine with any title confusingly similar to "Science", or with any title logo design confusingly similar to that now used by plaintiff American Association for the Advancement of Science on its magazine *Science.*

IT IS FURTHER ORDERED that within five days from this date counsel for plaintiff shall notify the Court, in writing, whether it intends to proceed with its claim for damages. If it does, then both parties through counsel shall notify the Court, in writing, no later than May 10, 1980, the time required for pre–trial preparation and for the hearing itself on the issues of damages and attorney's fees.