tions, Inc., a Delaware Corporation and Fireworks Television (US) Inc., a Nevada Corporation, Defendants–Appellees.

Docket No. 01–7983.

United States Court of Appeals, Second Circuit.

Argued Oct. 10, 2001.

Decided Jan. 14, 2002.

TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware Corporation, Plaintiff–Appellant,

v.

MARVEL ENTERPRISES, INC., a Delaware Corporation; Tribune Entertainment Company, a Delaware Corporation; Fireworks Communica-

Dale M. Cendali, O'Melveny & Myers LLP, New York, NY, for plaintiff-appellant.

Jonathan D. Reichman, (Dana R. Kaplan, John R. Hutchins, Kenyon & Kenyon, New York, NY, on the brief), for defendant-appellee Marvel Enterprises, Inc.

Maura J. Wogan, (Gerald E. Singleton, Edward Hernstadt, Frankfurt Garbus Kurnit Klein & Selz, P.C., New York, NY, on the brief), for defendant-appellee Tribune Entertainment Company.

Steven H. Rosenfeld, Jason A. Advocate, Ohrenstein & Brown, LLP, Garden City, NY, signed, on behalf of defendants-appellees Fireworks Communications, Inc., and Fireworks Television (US) Inc., the joint brief for all defendants-appellees.

Before JON O. NEWMAN and KEARSE, Circuit Judges, and CARMAN,* Chief Judge, United States Court of International Trade.

JON O. NEWMAN, Circuit Judge.

This appeal, raising issues concerning the rights of a trademark licensee, arises from a dispute between the motion picture studio that produced the film "X–Men" and the studio's licensor, which has published "X–Men" comic books and currently produces the television series, "Mutant X." Plaintiff–Appellant Twentieth Century Fox Film Corp. ("Fox") appeals from the Opinion and Order of the United States District Court for the Southern District of New York (Allen G. Schwartz, District Judge), entered August 13, 2001, denying a motion for a preliminary injunction to prevent the Defendants–Appellees Marvel Enterprises, Inc. ("Marvel"), Tribune Entertainment Co. ("Tribune"), and Fireworks Communications, Inc. and Fireworks Television (US), Inc. (collectively, "Fireworks") from airing the "Mutant X" television series, at least in its current form. The injunction was sought on the grounds that the TV series violated Fox's contractual rights and its rights under the Lanham Act. The ruling also dismissed Fox's Lanham Act claims. We conclude, contrary to the District Court, that a trademark licensee can sue its licensor for false advertising of the licensor's product, but we also conclude that the District Court did not err in denying the preliminary injunction. We there-fore affirm the denial of the preliminary injunction but remand for further proceedings consistent with this opinion.

## Background

*The Parties.* Fox is a Delaware corporation with its principal place of business in Los Angeles, California. Fox creates, produces, distributes, and markets throughout the world motion pictures and television shows, and goods, merchandise, and other products relating to such motion pictures and television shows. Marvel is one of the leading comic book/entertainment companies in the world, and is the largest publisher of comic books in the United States. Marvel's character-based entertainment business includes a proprietary library of over 4,500 characters. Marvel uses or licenses the use of its properties and characters on products, for special events, and in connection with animated and live action television series, television motion pictures, and theatrical film features.

*The "X–Men" Property.* In 1963, Marvel began publishing a comic book series entitled "X–Men," featuring a group of young, superpowered mutants led by Professor X, an older, superintelligent leader who sought to train his students and to protect them from a hostile society. Marvel has since released several dozen comic book series associated with the X–Men, including "Mutant X," which features the brother of one of the original X–Men.

*The 1993 Agreement.* In October 1993, Marvel and Fox signed an agreement (the "1993 Agreement") pursuant to which Marvel licensed to Fox all the rights that Fox may require in order to produce, distribute, exploit, advertise, promote, and

---

* Honorable Gregory W. Carman, Chief Judge, United States Court of International Trade, sitting by designation.

publicize theatrical motion pictures based on the "X–Men" comic book series. The "X–Men" comic book series, referred to in the Agreement as the "Property," includes the X–Men Characters, specifically the "core" Characters and the Characters of the "X–Universe"; their origin stories; storylines from individual comic books; and "all other elements relating to the Property and the Characters." The rights granted to Fox included "the right to use the title (or subtitle or portion of the title) of the Property or any component of the Property as the title of any Picture or related exploitation." The Agreement reserved all television rights to Marvel, subject to a proviso, critical to Fox's pending contract claim, that Marvel would not "produce, distribute or exploit or authorize the production, distribution or exploitation of any live-action motion picture" without Fox's consent (the "Freeze").

*The "Mutant X" Comic Books.* In November 1998, Marvel began publishing a comic book series called "Mutant X," which featured a character known both as Havok and Alex Summers, the brother of one of the original X–Men characters, known both as Cyclops and Scott Summers.

*The "X–Men" Film.* In 1999, Fox exercised the option granted by the 1993 Agreement and began shooting a motion picture entitled "X–Men." On July 14, 2000, the "X–Men" movie was released in theaters nationwide. Fox estimates that gross receipts from the film have totaled more than $290 million, not including earnings from the sales of videotapes, DVDs, and associated merchandising.

*The "Mutant X" TV Series.* In the summer of 2000, Marvel and Tribune entered into an agreement to develop a live-action television series, originally to be called "Genome X" and then changed to "Mutant X," involving characters that were the product of genetic splicing experiments gone awry. In November 2000, Tribune and Fireworks agreed to cooperate on the financing, production, and distribution of the TV series.

*The Instant Action.* In April 2001, Fox filed the instant lawsuit, claiming that the Defendants violated its intellectual property rights in the "X–Men" film and associated marketing and branding efforts by marketing and producing the "Mutant X" television series, whose concept, premise, and characters Fox alleges are virtually identical to those of the "X–Men" film. Further, Fox claims that in violating the contractual "Freeze," Marvel has created a "knock-off" product to "cash in" on Fox's efforts, thereby cheapening the value of Fox's film and associated marketing opportunities, inducing purchasers of TV programming and the public to believe that the "Mutant X" TV series is associated with Fox's film, and diminishing the market for Fox's planned sequel(s) to the "X–Men" film.

Fox sued for (1) breach of contract against Marvel, (2) breach of implied covenant of good faith and fair dealing against Marvel, (3) tortious interference with contractual relations against Tribune and Fireworks, (4) unfair competition and/or false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against all Defendants, (5) copyright infringement against all Defendants, (6) deceptive trade practices against all Defendants, and (7) common law unfair competition against all Defendants.

Fox filed a motion for a preliminary injunction, and the Defendants filed a motion to dismiss. The District Court (1) declined to dismiss the breach of contract claim, ruling that a significant factual dispute existed as to the scope of the rights under the contract; (2) dismissed the claim for breach of the implied covenant of good

faith and fair dealing, as duplicative of the contract claim; (3) dismissed the tortious interference with contract claim for failing to allege the required elements; (4) dismissed the Lanham Act claim on the ground that a trademark licensee has no goodwill in the licensed trademark, and therefore has no standing to sue; (5) declined to dismiss the copyright claim, finding that Fox sufficiently alleged the elements of a copyright cause of action with respect to its logos; (6) dismissed the common law unfair competition claim, because any misappropriation claim is preempted by the copyright laws, and any false designation/false advertising claim is precluded for the same reason as the Lanham Act claim; and (7) dismissed the deceptive trade practices claim, because no harm to the public is alleged or reflected in the record. *See Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.,* 155 F.Supp.2d 1 (S.D.N.Y.2001).

As to the motion for a preliminary injunction, the District Court held that Fox was likely to prevail on its breach of contract claim as to Marvel's use of the proposed title of the TV series, but not as to the characters or storylines, and that even as to the title, Fox had failed to show irreparable harm warranting a preliminary injunction. As to the copyright claim, the court granted a preliminary injunction prohibiting the Defendants from using video clips of the "X–Men" film in the promotion of the TV series, and prohibiting use of a substantially similar logo.

Fox appeals from the denial of its request for a broader preliminary injunction in aid of both its contract and Lanham Act claims. Fox also seeks reversal of the District Court's dismissal of the Lanham Act claim.

## Discussion

Our appellate jurisdiction is properly invoked under 28 U.S.C. § 1292(a)(1) to review the District Court's denial of Fox's motion for a preliminary injunction. Because that injunction was sought on the basis of both Fox's contract and Lanham Act claims, we consider each alleged basis for the injunction separately.

### 1. Contract Claim

The District Court declined to dismiss the breach of contract claim, ruling that a significant factual dispute exists as to the scope of the Freeze. 155 F.Supp.2d at 15–16, 44. Fox contended that the phrase "live-action motion picture for free television exhibition" in the Freeze provision applied to hour-long episodes of movies made for TV; Marvel contended that the phrase precluded (without Fox's consent) only production of feature-length movies made for TV. The District Court deemed the phrase ambiguous, read in the context of the Freeze provision and the entire Agreement. Concluding that resolving the ambiguity would require extrinsic evidence, the Court denied the motion to dismiss the contract claim. Turning to the preliminary injunction request, the Court concluded that Fox had shown a probability of success on its claim that the "Mutant X" TV series breached the Freeze provision with respect to the title of the series, *id.* at 36, but not as to the characters or storylines of the series, *id.* at 40, 43.

However, the Court denied the preliminary injunction for lack of an adequate showing of irreparable injury, ruling that any harm to Fox could be estimated in monetary terms. *See id.* at 44. The Court noted that "[e]ach side present[ed] equally plausible, yet equally indeterminate, views concerning the impact of a television series, in particular a live-action series, on the value of a theatrical motion picture based on the same underlying property which is produced after the tele-

vision series is released." *Id.* at 43. The Court contrasted Fox's view that a TV series of inferior quality, available on free TV, would impair the market for a sequel to the "X–Men" film with Marvel's view that the TV series would widen the audience for "X–Men" characters and increase the value of Fox's films. Assessing the affidavit evidence in support of these conflicting claims, the Court concluded that Fox had not shown any harm that "is actual or imminent," *id.* at 44, that "nothing in the record indicates that the new [TV] series will be of low quality," *id.*, and that any loss of profits to Fox, "although difficult to precisely quantify ... may be estimated in monetary terms," *id.* We review the Court's determination concerning irreparable injury for abuse of discretion, and conclude that the allowable discretion was not exceeded. In the first place, "when a party can be fully compensated for financial loss by a money judgment, there is simply no compelling reason why the extraordinary equitable remedy of a preliminary injunction should be granted."[1] *Borey v. National Union Fire Insurance Co.,* 934 F.2d 30, 34 (2d Cir.1991). Moreover, the claim that a TV series of hour-long episodes, because of its allegedly poor quality, will impair the market for the sequel to a movie shown in theaters seems especially strained when the youthful age group of the likely audience is considered. Finally, the equities weigh against halting a TV series now being aired because of alleged injury to a film sequel that is, at best, in the planning stage.

### 2. Lanham Act Claim

■ The District Court gave no separate consideration to the preliminary injunction request based on Fox's Lanham Act claim because the Court dismissed that claim on the ground that Fox, as Marvel's licensee, had no goodwill of its own in the "X–Men" property. Although the dismissal of one claim in the absence of final judgment disposing of all claims is not appealable in the absence of compliance with Rule 54(b) of the Federal Rules of Civil Procedure, we are entitled to make some assessment of the sufficiency of Fox's Lanham Act claim in order to determine whether a preliminary injunction was properly denied with respect to that claim. *See Volvo North America Corp. v. Men's International Professional Tennis Council,* 839 F.2d 69, 75–76 (2d Cir.1988) (grant of motion to dismiss certain counts reviewable because ruling in effect denied injunctive relief).[2]

---

**1.** Of course, if Fox prevails on the merits at trial, any claim by the Defendants that damages are too speculative to be reasonably estimated will be substantially undermined by their current position that irreparable injury, required for preliminary injunctive relief, has not been shown because, if there are any damages, they can be adequately compensated by a subsequent monetary award. *See* Brief for Appellees at 25 ("Here, Fox's claim that the financial injury to future X–Men sequels will be impossible to calculate is belied by two of its own witnesses, who testified that any financial harm to future X–Men sequels could be calculated.... It was not clearly erroneous for the District Court ... to conclude that Fox thus has an adequate remedy at law.").

**2.** The Supreme Court has stated that a ruling that has the effect of denying an injunction is appealable under 28 U.S.C. § 1292(a)(1) "only in circumstances where an appeal will further the statutory purpose of 'permit[ting] litigants to effectually challenge interlocutory orders of serious, *perhaps* irreparable, consequence.'" *Carson v. American Brands, Inc.,* 450 U.S. 79, 84, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) (quoting *Baltimore Contractors, Inc. v. Bodinger,* 348 U.S. 176, 181, 75 S.Ct. 249, 99 L.Ed. 233 (1955)) (emphasis added). Whether or not Fox has shown a sufficient risk of irreparable injury to require reversal of the denial of its motion for a preliminary injunction, which is the ultimate issue on appeal, its allegations sufficiently allege the possibility of

■ Fox challenges the District Court's rejection of both its false designation of origin and its false advertising claims, which Fox sometimes combines into a generalized unfair competition claim. The claims are distinct, *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 139 (2d Cir.1991); *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 188 (2d Cir. 1980), and require separate consideration.

■ To the extent that Fox is alleging that the Defendants are falsely designating the origin of the TV series, the claim was properly dismissed. The District Court was correct in noting that the "origin" of the series (and the film), within the meaning of trademark law (*i.e.*, the source of the goodwill inhering in the trademarks that Marvel licensed to Fox), is Marvel, the owner of the marks. 155 F.Supp.2d at 22 n. 33. Indeed, Marvel, as the licensor of the "X–Men" property, is obliged to maintain some control over the quality of the licensed property as an incident of valid licensing or risk abandonment of its mark. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir.1959); 2 *McCarthy on Trademarks and Unfair Competition* § 18.42, at 18–66 (4th ed.2001). Fox, on the other hand, as Marvel's licensee, can claim no impairment of goodwill in the "X–Men" property associated with the "X–Men" trademark, *see id.* § 18.52, at 18–88 ("It is clear that use of a mark by a person while such person was a licensee builds up no rights in the mark as against the licensor.") .[3] Of course, if Marvel were representing that its TV series had been produced by Fox, thereby promoting the series on the basis of the goodwill associated with the mark "Fox," Fox would be able to claim false designation of origin.[4]

■ Nevertheless, Fox is not precluded as a licensee of Marvel from pursuing its claim that Marvel has falsely advertised its TV series, in particular by billing the "Mutant X" series as a "spin-off" of the "X–Men" movie. First Amended Complaint ¶ 39. A licensee is not without recourse under section 43(a) of the Lanham Act if its licensor makes false claims to promote a competing product (or falsely disparages the licensee's product). The licensor's sole enjoyment of the goodwill in the licensed mark does not entitle it to make false claims to promote its own prod-

---

irreparable consequence to warrant review of the dismissal of the Lanham Act claim on which injunctive relief is sought.

3. Fox contends that in *Silverstar Enterprises, Inc. v. Aday*, 537 F.Supp. 236 (S.D.N.Y.1982), the court "ruled" that the plaintiff-licensee "had standing to assert § 43(a) claims against its licensor." Brief for Appellant at 22. Although the District Court there noted that standing under section 43(a) "may lie with users of trademarks who are not owners of the marks," *id.* at 241, the Court in fact ruled that the licensee had failed to state a claim as to either false designation or false description, *id.* Fox also overreads *Staff Builders of Philadelphia, Inc. v. Koschitzki*, CIV. A. No. 88–6103, 1989 WL 97407 (E.D.Pa. Aug.18, 1989), citing it for the proposition that a trademark licensee could sue its licensor "for false desig-

nation of origin." Brief for Appellant at 23. The licensee's claim was that the licensor had violated an exclusive territorial license by licensing a competitor in the plaintiff's territory. The Court permitted amendment of the complaint to allege a section 43(a) claim, but said nothing about false designation of origin. *Id.* at *2.

4. Fox's Complaint accuses the Defendants of "improperly marketing and promoting" the TV series "so as to create *a false association between the Defendants' television show and Fox's 'X–Men' motion picture*," and thereby "falsely designated to the general public the nature, origin, and source" of the TV series. First Amended Complaint ¶ 59 (emphasis added). The Complaint does not allege, however, that the Defendants have represented that Fox produced the TV series.

uct, allegedly to the detriment of its licensee. Trademark licensees have been permitted to sue competitors under section 43(a), *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir.1977); *Mastercard International Inc. v. Sprint Communications Co.*, No. 94 CIV. 1051(JSM), 1994 WL 97097, at *3 (S.D.N.Y. Mar.23, 1994); *Business Trends Analysts v. Freedonia Group, Inc.*, 650 F.Supp. 1452, 1457 (S.D.N.Y.1987), and we see no reason why a false advertising claim may not be brought by a licensee just because the alleged violator is the licensor.

Fox's Complaint endeavors to blend its claim of false advertising with a claim of false designation of origin by accusing the Defendants of "improperly marketing and promoting" the TV series "so as to create a false association between the Defendants' television show and Fox's 'X–Men' motion picture," and *thereby* "falsely designat[ing] to the public the nature, origin, and source" of the TV series. First Amended Complaint ¶ 59 (emphasis added). Improperly marketing the TV series by creating the false impression of a link between the TV series and the movie is a false claim about the series, actionable as false advertising. Such marketing is not a representation that the TV series has originated with Fox, *i.e.*, that it has been produced subject to the quality control that Fox would have to exercise to permit the TV producer to benefit from the goodwill associated with Fox's own mark.[5]

■ However, despite the sufficiency of the false advertising component of Fox's Lanham Act claim, the District Court's denial of a preliminary injunction need not be disturbed. In the first place, most, and perhaps all, of the allegedly false advertising by the Defendants in the promotion of the TV series has already occurred, and some elements of the promotion campaign have been withdrawn or modified. Fox presents no substantial claim that the mere airing of the TV series, which is what Fox now seeks to enjoin, amounts to false advertising.[6] Moreover, the District Court's rejection of Fox's claim of irreparable injury with respect to its contract claim appears to be equally applicable to whatever aspects of the Lanham Act claim are viable. If Fox's lost profits can be reasonably estimated to assess damages for the alleged breach of contract, they can be similarly determined to compensate for whatever section 43(a) claim Fox can prove at trial. Thus, the denial of the preliminary injunction, for lack of an adequate showing of irreparable injury, was within the District Court's discretion, regardless of the legal theory on which the injunction was sought.

## Conclusion

We therefore affirm the denial of the preliminary injunction but remand for further proceedings consistent with this opinion.

---

5. Precisely what Fox means by "a false association between" the TV series and the movie can be explored on remand in discovery to determine whether any aspect of this claim can survive a summary judgment motion and warrant a trial.

6. Whether such a claim .can be developed upon a full trial remains to be determined.