OPINION
 

 PAUL L. FRIEDMAN, District Judge.
 

 This matter came before the Court for a bench trial on the parties’ cross-motions for a permanent injunction. The dispute relates to which party has the right to use in the Washington, D.C. metropolitan area the name and insignia associated with one of the three major political parties in the Dominican Republic, the Partido Revolu-cionario Dominicano (“PRD”). Plaintiffs contend that defendants have intentionally created confusion among individuals who are interested in Dominican political issues by using the name and insignia of the PRD in an unauthorized manner, which use has caused and will continue to cause irreparable harm to their group — the first group to use the PRD name and insignia. Plaintiffs claim a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law trademark infringement. Defendants filed counterclaims on similar grounds, but in defendants’ favor. Both parties seek permanent injunctive relief.
 

 A bench trial took place over three days in the Fall of 2002. At the trial, plaintiffs called as witnesses members of plaintiffs’ organization, President Hector Santos and Organizational Secretary An-dreas Beriguete. They also called as adverse witnesses President Franklin Jimenez and Vice President Guillermo Rivera of defendants’ organization and offered the deposition testimony of Dr. Rafael Bonilla, Secretary of the PRD in the Dominican Republic and a former Cabinet Minister in the Dominican Republic. Plaintiffs then called Shelley Blumberg Lorenzana as an expert witness in translation to translate two documents plaintiffs offered in evidence. In their case-in-chief, defendants called as witnesses Vice President in Function Felipe Rodriguez,
 
 *XLVIII
 
 Mr. Rivera and Secretary General Ivan Romero, all from defendants’ organization, and Dr. Rafael Lantigua, who is the Federal President of the PRD for the United States, Canada and Puerto Rico. In addition, the Court accepted in evidence numerous documents offered in support of the parties’ claims.
 
 [1]
 
 After carefully considering the briefs and arguments of counsel for the parties in support of their cross-motions for permanent injunctive relief, the testimony of the witnesses at trial and the admitted documentary evidence, the Court concludes that plaintiffs are entitled to injunctive relief and that defendants are not. It therefore will grant plaintiffs’ motion and will deny the motion of defendants.
 

 I. FINDINGS OF FACT
 

 Upon a careful consideration and evaluation of the testimony of all the witnesses and the documentary evidence admitted at trial, and making credibility findings as necessary and appropriate to resolve any material discrepancies in the testimony, the Court makes the following findings of fact:
 

 A.
 
 Partido Revolucionario Dominica-no Seccional of Washington, D.C.
 

 The PRD is one of three major political parties in the Dominican Republic. The PRD has authorized the establishment of chapters, or “seccionáis,” outside of the Dominican Republic in order to provide a forum for political discussion and social and cultural interaction of Dominicans living abroad, as well as for individuals generally interested in issues related to the Dominican Republic.
 
 See
 
 Transcript of Trial, October 11, 2002 (“Tr.”) at 10:21-12:9 (H.Santos).
 
 [2]
 
 According to the general by-laws of the PRD, there is a procedure by which interested groups become authorized as official seccionáis. Specifically, “[t]he Political Commission of the Party shall authorize in each case the creation and integration of the Sectionals outside of the country and in the Zones, along with their respective jurisdictions.” Defs.’ Ex. 30(b), Excerpt from the General Statutes of the Dominican Revolutionary Party (“By-laws”) ¶2; Tr. 91:2-5, 95:5-6 (F.Jimenez). The By-laws also provide that a federal committee in the United States shall exist “which, as the superior body within the hierarchy, shall coordinate the activities of the Party throughout all of North America,” including the activities of seccionáis.
 
 See
 
 By-laws ¶ 1. The president of the Federal Committee during the relevant time period was Dr. Rafael M. Lanti-gua, who testified on defendants’ behalf.
 

 Plaintiffs comprise a seccional of the PRD authorized by the Political Commission and established in 1982. It is run by a Board of Directors and sponsors various social events, political rallies, fundraisers and similar activities related to the Dominican Republic and the PRD.
 
 See
 
 Tr. at 11:21-22 (H.Santos). The seccional also participates in an official capacity in the nomination of the PRD candidate for the presidency of the Dominican Republic.
 
 See
 
 Tr. at 17:3-19:2 (H.Santos). Plaintiffs’
 
 *XLIX
 
 group has members from the District of Columbia, Maryland and Virginia.
 
 See
 
 Pis.’ Ex. 20(a), Seccional de Washington, Maryland & Virginia Lista de Militantes; Pis.’ Ex. 20(b), Programa de Revision y Apertura Del Registro de Militantes; Tr. at 73:10-21, 74:19-75:2 (Averigüete). The majority of plaintiffs’ members are from Maryland, and meetings are held throughout the greater metropolitan area including in Maryland and Virginia.
 
 See
 
 Tr. at 15:12-16:23 (H.Santos).
 

 The official name of plaintiffs’ group at its inauguration in 1982 was Partido Revo-lucionario Dominicano Seccional of Washington, D.C.
 
 See
 
 Tr. at 32:1-4 (H.Santos). The organization began using the name Partido Revolucionario Dominicano Sec-cional Metropolitana de Washington D.C., Maryland y Virginia in 2000.
 
 See id.
 
 at 31:5-6. Individually, plaintiffs are three corporations: one incorporated in Washington D.C. on March 31, 2002, under the name “Partido Revolucionario Dominicano (PRD), Seccional Metropolitana de Washington-DC, Maryland y Virginia;” one incorporated in Virginia on December 1, 2000, under the name “Partido Revolucion-ario Dominicano (PRD), Seccional Metro-politana de Washington-DC, Maryland y Virginia;” and one incorporated in Maryland on April 7, 2000, under the name “Partido Revolucionario Dominicano (PRD), Seccional Metropolitana de Washington-D.C., Maryland and Virginia, Ltd.” (collectively, “PRD-DC”).
 
 See
 
 Pis.’ Ex.l, Government of the District of Columbia Certificate of Incorporation (March 31, 2000); Pis.’ Ex. 2, Commonwealth of Virginia State Corporation Commission Certificate of Incorporation (December 1, 2000); Pis.’ Ex. 3, State of Maryland Certificate of Incorporation.
 

 As an authorized seccional, plaintiffs have a non-exclusive license to use the name and insignia of the PRD in their publications and in the course of their activities.
 
 See
 
 Tr. at 19:3-10 (H.Santos); Defs.’ Ex. 34, Affidavit of Rafael A. Lanti-gua, M.D. (“Lantigua Aff.”) ¶ 11. A group may not use the name Partido Revolucion-ario Dominicano unless it officially has been approved by the PRD’s Political Commission as a seccional.
 
 See
 
 Tr. at 95:11-14; 127:8-10 (F.Jimenez).
 

 B.
 
 “Partido Revolucionario Dominica-no, Seccional de Maryland y Virginia”
 

 In 1996, several individuals decided to form a new seccional separate from PRD-DC to be called “Partido Revo-lucionario Dominicano, Seccional de Maryland y Virginia,” (“PRD-MD/VA”). PRD-MD/VA focused on membership in Maryland and Virginia, although the group did not have a policy of rejecting individuals from Washington, D.C.
 
 See
 
 Rodriguez Test. (Nov. 19, 2002).
 
 [3]
 
 After assessing the potential membership base of a new sec-cional, PRD-MD/VA applied to be an official seccional in January of 1999.
 
 See
 
 Defs.’ Ex. 10, Letter of Application; Tr. at 116:1-18 (F.Jimenez); Rodriguez Test. (Nov. 19, 2002). This application was rejected verbally by the then-PRD President Emmanuel Esqua Guerrero at a meeting in New York, and ultimately was never
 
 *L
 
 approved.
 
 See
 
 Tr. at 117:19-119:4 (F.Jimenez); Lantigua Test. (Nov. 19, 2002). PRD-MD/VA submitted a second application to become an authorized seccional in November 1999.
 
 See
 
 Defs.’ Ex. 11, Letter from PRD-MD/VA to PRD President Ha-tuey DeCamps requesting authorization of PRD-MD/VA as a seccional; Tr. at 117: 9-16 (FJimenez).
 
 [4]
 

 While both Mr. Jimenez and Mr. Rodriguez testified that Dr. Lantigua had authorized PRD-MD/VA as a seccional, both witnesses admitted that the Federal Chairman is not authorized to do so; only the PRD Political Commission is.
 
 See
 
 Tr. at 94:15-20 (F.Jimenez); Rodriguez Test. (Nov. 19, 2002). Instead, the Federal Chairman’s role in the admission of new seccionáis is to swear in the seccional after receiving “orders from the party in the Dominican Republic.” Tr. at 94:21-22 (F.Jimenez). Although several defense witnesses testified that the Federal Chairman received authorization to authorize PRD-MD/VA,
 
 see
 
 Tr. at 110: 21-24 (F.Jimenez); Romero Test. (Nov. 19, 2002); Rivera Test. (Nov. 20, 2002), this testimony is either conclusory and not supported by evidence or based on Dr. Lanti-gua’s assurances that PRD-MD/VA had been authorized by the PRD, which does not suffice to prove that authorization in fact had been given.
 
 [5]
 

 In his pre-trial affidavit, Dr. Lantigua averred that “[t]he P.R.D. has by-laws that govern the way that the P.R.D. and committees, seccionales, and other sub-groups that are authorized pursuant to those Bylaws ... operate and conduct themselves.” Defs.’ Ex. 34, Lantigua Aff. ¶ 3. Dr. Lanti-gua also averred that as president of the Federal Committee, he serves as “the leader of the ‘Federación de Seccionales,’ which authorizes and oversees the operations and activities of numerous ‘seccio-nales’ or branches around the country.”
 
 Id.
 
 ¶ 6. In his testimony at trial, however, Dr. Lantigua conceded that only the Political Commission makes decisions regarding authorization of seccionáis.
 
 See
 
 Lantigua Test. (Nov. 19, 2002).
 
 [6]
 

 
 *LI
 
 Defendants have offered no evidence in the form of minutes of the meeting at which the Political Commission purportedly authorized PRD-MD/VA, the affidavit or testimony of any individual who attended such a meeting, or any official authorization document. Dr. Lantigua testified that he believed PRD-MD/VA had been approved, and that he would not have sworn in PRD-MD/VA had the group not been authorized by the Political Commission, but his statement of belief is insufficient to demonstrate authorization.
 
 See
 
 Lantigua Test. (Nov. 19, 2002). By contrast, Dr. Rafael Bonilla, General Secretary of the PRD, member of the Political Commission and official party spokesman, unequivocally stated in a pre-trial deposition that was admitted in evidence that PRD-MD/VA is not officially recognized as a seccional because it has never been approved by the Political Commission.
 
 See
 
 Pis.’ Ex. 20, Deposition of Rafael S. Bonil-la, Oct. 4, 2002 at 10:8-11:3, 14:21-17:23. Upon review of all the evidence the Court finds that there is no evidence before it that the Political Commission of the PRD officially authorized PRD-MD/VA to be an official seccional in accordance with the PRD By-laws, Dr. Lantigua’s assurances notwithstanding.
 

 Dr. Lantigua presided over a swearing-in ceremony for PRD-MD/VA on September 30, 2000.
 
 See
 
 Rodriguez Test. (Nov. 19, 2002). The invitation for the inauguration featured the name “PRD” together with PRD-MD/VA’s name.
 
 See
 
 Defs.’ Ex. 12(a) (invitation to inauguration event). The name and insignia of the PRD also were featured prominently on decorations displayed at the inauguration event itself.
 
 See
 
 Defs.’ Ex. 12(b), Photographs of Inauguration (name and insignia of PRD prominently displayed at the event).
 

 Following the September 30, 2000 inauguration party, PRD-MD/VA made an effort to gain members, raise funds, and work with non-profits in philanthropic endeavors. In doing so, the group intended to expand what it considered to be PRD-DC’s limited purpose beyond political activities.
 
 See
 
 Rodriguez Test. (Nov. 19, 2002). As part of this effort, PRD-MD/VA held several events for which it sent invitations or distributed flyers that featured the name and insignia of the PRD, including a celebratory inauguration party on December 1, 2000.
 
 See
 
 Rodriguez Test. (Nov. 19, 2002); Defs.’ Ex. 15, Invitation to Dec. 1, 2000 event; Defs.’ Ex. 16(a), flyer for Dec. 1, 2000 party; Defs.’ Ex. 16(b)-(g) (letters of invitation to Dec. 1, 2000 party). The PRD insignia was prominently displayed at the December 1, 2000 party as well.
 
 See
 
 Defs.’ Ex. 17(a)-(b) (photographs of Dee. 1, 2000 event).
 

 PRD-MD/VA subsequently distributed a newsletter that featured the name and insignia of the PRD,
 
 see
 
 Defs.’ Ex. 19(a) (“Seccional PRD ‘Don Antonio Guzman Fernandez’ Maryland y Virginia” Boletín Informativo Mesual), and distributed invitations and flyers and held numerous events that prominently displayed the PRD name and insignia. These included: (1) a fundraiser sponsored by PRD-MD/VA
 
 (see
 
 Defs.’ Ex. 19(b)) (informational flyer for fundraiser); (2) a letter of invitation to PRD president Hatuey DeCamps from Ivan Romero to attend a party in honor of the first anniversary of “inauguration”
 
 (see
 
 Defs.’ Ex. 19©); (3) the first anniversary party itself, at which the PRD name and insignia were displayed
 
 *LII
 
 (see Defs.’ Ex. 19(d)) (photograph of event); (4) a calendar of 2001 events of PRD-MD/VA (see Defs.’ Ex. 19(D); and (5) a party honoring Dominican Mothers (see Defs.’ Ex. 19(g) (invitational promotion)).
 

 After PRD-MD/VA began advertising its events using the PRD name and insignia, individuals approached PRD-DC board members inquiring about the events. These individuals were confused and assumed that PRD-DC was sponsoring the activities.
 
 See
 
 Tr. at 21:13-22:22, 26:6-13, 29:10-21. (H.Santos).
 
 [7]
 

 On November 21, 2000, .PRD-DC through counsel sent a letter to PRD-MD/VA asserting that the latter group was using the name and insignia of the PRD in violation of the law and requesting that PRD-MD/VA cease and desist using the name.
 
 See
 
 Pis.’ Ex. 7, November 21, 2000 Letter from Stanley H. Goldschmidt, Esq. to Dr. Guillermo Rivera. Dr. Rivera responded to the letter, stating that he did not “have a problem complying to [the] letter, but [he would] not accept any responsibility for other individuals who might use any stationery, material, cards, advertisements and the like. Therefore, [Dr. Rivera would] cease to distribute any of the items” delineated in Mr. Gold-schmidt’s letter. Pis.’ Ex. 9, November 24, 2000 Letter
 
 from
 
 Dr. Guillermo Rivera to Stanley H. Goldschmidt, Esq. Dr. Rivera testified at trial that he foresaw no problem in complying with the letter because he interpreted it as instructing him not to use “Washington, D.C.” with respect to his group, PRD-MD/VA.
 
 See
 
 Tr. at 140:7-15 (G.Rivera). PRD-MD/VA did not cease using the name PRD or its insignia.
 

 II. DISCUSSION
 

 Plaintiffs filed suit raising two claims: (1) a violation of Section 43(a) of the Lan-ham Act, 15 U.S.C. § 1125(a); and (2) common law trademark infringement. Specifically, plaintiffs argue that by using the name “Partido Revolucionario Domini-cano, Seccional de Maryland y Virginia” or any of its counterparts and the PRD insignia without plaintiffs’ consent, knowledge or authorization, defendants have infringed on plaintiffs’ exclusive license to use the name PRD and its insignia as an authorized seccional in the Washington, D.C. metropolitan area. Defendants counterclaim, raising identical claims and arguing that by using the name Partido Revolu-cionario Dominicano Seccional Metropoli-tana de Washington D.C., Maryland y Virginia rather than Partido Revolucionario Dominicano Seccional de Washington D.C., plaintiffs improperly expanded their name, and by doing so have infringed on defendants’ authorized name. Both parties moved for a permanent injunction restricting the other from,
 
 inter alia,
 
 using the name and insignia of the PRD in the current form.
 

 A.
 
 Standard for Permanent Injunction
 

 In determining whether to enter a permanent injunction, the Court considers a modified iteration of the factors it utilizes in assessing preliminary injunctions: (1) success on the merits, (2) whether the plaintiffs will suffer irreparable injury absent an injunction, (3) whether, balancing the hardships, there is harm to defendants or other interested parties, and (4) whether the public interest favors granting the injunction.
 
 See National Ass’n of Psychiatric Health Systems, et al. v. Shalala,
 
 120 F.Supp.2d 33, 44 (D.D.C.2000).
 
 See also Amoco Production Co. v. Village of Gam
 
 
 *LIII
 

 bell,
 
 480 U.S. 581, 546 n. 12,107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (“The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.”);
 
 National Mining Ass’n v. U.S. Army Corps of Engineers,
 
 145 F.3d 1399, 1408-09 (D.C.Cir.1998) (demonstration of actual success on the merits required for permanent injunctive relief). The Lanham Act expressly provides that “courts vested with jurisdiction of civil actions arising under this [Act] shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, ... to prevent a violation under subsection (a), (c), or (d) of section 1125(a) of this title.” 15 U.S.C. § 1116(a).
 

 B.
 
 Success on the Merits
 

 1. Section 43(a) of the Lanham Act
 

 In order to prevail in a trademark infringement case under the Lanham Act, “the plaintiff must show (1) that it owns a valid trademark, (2) that its trademark is distinctive or has acquired a secondary meaning, and (3) that there is a substantial likelihood of confusion between the plaintiffs mark and the alleged infringer’s mark.”
 
 Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Association,
 
 929 F.Supp. 473, 476 (D.D.C.1996) (citing
 
 Sears, Roebuck and Co. v. Sears Financial Network,
 
 576 F.Supp. 857, 861 (D.D.C.1983)) (additional citation omitted). These protections extend to the names and symbols related to political organizations.
 
 See United We Stand America, Inc. v. United We Stand, America New York, Inc.,
 
 128 F.3d 86, 90 (2d Cir.1997).
 

 When a tradename is not registered on the United States Principal Register of Trademarks, it can nonetheless benefit from Lanham Act protection.
 
 See Duggal v. Krishna,
 
 554 F.Supp. 1043, 1044 n. 4 (D.D.C.1983) (“The Lanham Act’s proscription of unfair competition ... is available to the owner of an unregistered mark.”). Here, both plaintiffs and defendants bring suit under 15 U.S.C. § 1125(a), which provides in relevant part that:
 

 [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 

 15 U.S.C. § 1125(a)(1). Courts have concluded that this section provides a cause of action to the licensee of a trademark or tradename against a competitor for improper use of the licensed mark.
 
 See Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.,
 
 277 F.3d 253, 260 (2d Cir.2002);
 
 Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.,
 
 567 F.2d 154, 160 (1st Cir.1977) (exclusive licensee of product in United States has standing under Section 1125(a) as one “who suffered] adverse consequences from a violation”).
 

 The analysis for unfair competition under Section 43(a) of the Lanham Act is essentially the same as the analysis for trademark infringement. “Where [the mark] is not inherently distinctive, the essential elements are the same for either a
 
 *LIV
 
 trademark infringement or unfair competition action.”
 
 American Association for the Advancement of Science v. Hearst Corp.,
 
 498 F.Supp. 244, 261-262 (D.D.C.1980). In addition, “the remedy for unfair competition, injunctive relief, is the same as that provided by the infringement law.”
 
 Id.
 
 at 262. The Court therefore will apply the
 
 Sears, Roebuck
 
 infringement test to the parties’ claims.
 

 a. Ownership of the Mark
 

 The first prong of the
 
 Sears, Roebuck
 
 analysis requires a party to demonstrate “ownership” of the mark in question. In the absence of a registered trademark, the Court assesses the factual circumstances from which the claims arise in order to determine whether the party claiming infringement or unfair competition has a cognizable interest in the mark or name in question.
 
 See Duggal v. Krishna,
 
 554 F.Supp. at 1047 (where the mark in dispute was the name of a periodical, the court conducted inquiry as to which party owned the periodical). Here, the “ownership” question boils down to whether either group has a license from the PRD to use the name and insignia of the party. As the Court has found, plaintiffs as an authorized seccional have a nonexclusive license from the PRD to use the name and insignia of the PRD in their activities and publications.
 
 See supra
 
 at 6-7. Accordingly, the Court concludes that plaintiffs meet the first prong of the Sears,
 
 Roebuck
 
 test.
 

 As the Court also has found, however, a group may not use the name Partido Revo-lucionario Dominicano or its insignia unless it officially has been approved by the Political Commission as a seccional.
 
 See supra
 
 at 7, 8. Because the Court found that plaintiffs were approved to use the name but that defendants failed to produce any evidence that the Political Commission of the PRD ever authorized PRD-MD/VA,
 
 see supra
 
 at 9, the Court concludes that defendants’ group does not have a license to use the name and insignia of the PRD. Defendants therefore fail to meet the first prong of the
 
 Sears, Roebuck
 
 standard, and their claim against plaintiffs fails.
 

 b. Distinctiveness and Secondary Meaning
 

 With respect to the second prong of the
 
 Sears, Roebuck
 
 test, the Court in
 
 Malarkey-Taylor
 
 stated:
 

 The general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning. Generic and descriptive terms receive little or no trademark protection, while suggestive, arbitrary or fanciful marks are viewed as inherently distinctive and entitled to varying degrees of protection.
 

 Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Association,
 
 929 F.Supp. at 476 (quotation and citation omitted).
 
 See also The Appleseed Foundation, Inc. v. Appleseed Institute, Inc.,
 
 981 F.Supp. 672, 675 (D.D.C.1997). A mark has secondary meaning “if it inspires an association in the minds of the relevant buying public between the name of the product and the product itself, or its source.”
 
 Duggal v. Krishna,
 
 554 F.Supp. at 1047 (citing
 
 American Association for the Advancement of Science v. Hearst Corp.,
 
 498 F.Supp. at 255).
 

 The existence of secondary meaning under Section 43(a) is a factual determination and, while there is no definitive list of criteria used to determine secondary meaning, courts do look to “(1) the duration and continuity of use of the mark, (2) the extent of advertising and promotion and amount of money spent thereon, (3)
 
 *LV
 
 figures showing sales of plaintiffs products or number of people who have viewed it, and (4) identification of plaintiffs and defendant’s respective markets.”
 
 American Association for the Advancement of Science v. Hearst Corp.,
 
 498 F.Supp. at 257.
 
 See also Russian Academy of Sciences, et al. v. American Geophysical Union,
 
 No. 98-2165, 1998 U.S. Dist. LEXIS 20598, at *12 (D.D.C. Dec. 16, 1998). The relevant inquiry is not whether the general public associates a name with a product or a source, but rather whether the “relevant buyer class” does.
 
 American Association for the Advancement of Science v. Hearst Corp.,
 
 498 F.Supp. at 256. In this action, the question is whether persons in the Washington, D.C. metropolitan area who are interested in the PRD and its political activities associate the name and insignia of the PRD with plaintiffs’ group.
 

 The Court concludes that plaintiffs have demonstrated that such an association exists between the name and insignia of the PRD and PRD-DC and that PRD-DC and its various corporate names thus have acquired secondary meaning. Plaintiffs have shown that since its inception in 1982 its large membership and like-interested individuals have looked to plaintiffs to represent them in matters related to the PRD, including in an official capacity in the PRD political conventions in the Dominican Republic.
 
 See supra
 
 at 6-7. The formal authorization of PRD-DC as a seccional underscores this connection because individuals interested in activities related to the PRD likely are aware of the existence of the “seccional” system and look to official seccionáis to provide a local link to the PRD. In addition, defendants’ use of the name and insignia of the PRD in the same geographic area or “market” in connection with activities similar to those of PRD-DC, such as fundraisers for the PRD and events involving PRD officials, further evidences the secondary meaning and the goodwill attached to these marks.
 
 See Russian Academy of Sciences, et al. v. American Geophysical Union,
 
 1998 U.S. Dist. LEXIS 20598, at * 13 (mimicking of plaintiffs journal title in defendant’s marketing materials indicates secondary meaning in relevant target population).
 

 c. Likelihood of Confusion
 

 The third prong of the
 
 Sears, Roebuck
 
 test asks “whether the relevant purchasing public is likely to be confused by the use of the defendants’ mark.”
 
 Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Association,
 
 929 F.Supp. at 476. “The crucial focus of the inquiry is the effect of the defendant’s mark on prospective purchasers. If the [mark] is likely to have the effect of confusing purchasers into believing that the [the defendant’s mark] is somehow associated with [plaintiffs mark ... ] or if it would tend to cause purchasers to mistake the [defendant’s mark] for [the plaintiffs mark] itself ... the requirements for finding this element of infringement are satisfied.”
 
 American Association for the Advancement of Science v. Hearst Corp.,
 
 498 F.Supp. at 257.
 
 See also The Appleseed Foundation, Inc. v. Appleseed Institute, Inc.,
 
 981 F.Supp. at 675 (“[T]he Court looks at the effect that defendant’s use of the mark has or would have on prospective consumers within the relevant product market.”);
 
 Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Association,
 
 929 F.Supp. at 477 (“[T]he focus is on whether a similarity exists that is likely to cause confusion.”).
 

 Here, plaintiffs have demonstrated that actual confusion occurred as a result of PRD-MD/VA using the PRD name and insignia.
 
 See supra
 
 at 9-10. And while a party need not demonstrate actual
 
 *LVI
 
 confusion in order to satisfy the third prong of the
 
 Sears, Roebuck
 
 test, “ ‘there can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion.’ ”
 
 Russian Academy of Sciences, et al. v. American Geophysical Union,
 
 1998 U.S. Dist. LEXIS 20598, at *22 (quoting
 
 American Association for the Advancement of Science v. Hearst Corp.,
 
 498 F.Supp. at 258).
 
 See also The Appleseed Foundation, Inc. v. Appleseed Institute, Inc.,
 
 981 F.Supp. at 675 (“[E]videnee of actual confusion is substantial proof of this element.”);
 
 Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Association,
 
 929 F.Supp. at 477 (“[AJctual confusion is substantial proof of the existence of the likelihood of confusion”). Even if the evidence of actual confusion is not overwhelming, however, “the instances documented [by plaintiffs] demonstrate that confusion is likely.”
 
 National Rural Electric Cooperative Association v. National Agricultural Chemical Association,
 
 26 U.S.P.Q 2d 1294, 1296, 1992 WL 477020 (D.D.C.1992).
 

 In assessing the likelihood of confusion, the Court may consider a number of factors. While not all of these factors need be present in every case, the factors include: (1) the strength of the plaintiffs mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) evidence of actual confusion; (5) the defendants’ purpose or reciprocal of good faith in adopting its own mark;
 
 [8]
 
 (6) the quality of defendants’ product; and (7) the sophistication of the buyers.
 
 See Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Association,
 
 929 F.Supp. at 477 (citing
 
 Polaroid Corp. v. Polorad Elec. Corp.,
 
 287 F.2d 492, 495 (2d Cir.1961)).
 

 In this case, plaintiffs’ use of the name and insignia of the PRD is long-standing and strong. As the only official seccional of the PRD in the Washington, D.C. area for over 22 years, thirteen of which were prior to the creation of PRD-MD/VA, it is likely that the relevant population presumed that PRD-DC was the entity sponsoring events in this area that were advertised with the' name and insignia of the PRD.
 
 [9]
 
 The two groups’ names are strikingly similar; they differ only in the inclusion of Washington, D.C. in PRD-DC’s name. PRD-MD/VA uses the name and the insignia of the PRD in the same manner as PRD-DC does, as part of its official name and in printed materials relating to the group. The target populations reside in the same metropolitan area and overlap almost completely. PRD-DC has members from Washington, D.C., Maryland and Virginia; while PRD-MD/VA targets members only in Maryland and Virginia, it does not officially exclude Washington, D.C. residents.
 
 See supra
 
 at 7. In addition, the purpose of PRD-MD/VA is similar to that of PRD-DC in providing an official link between the residents of the Washington, D.C. metropolitan area in Maryland and Virginia to the PRD.
 
 See supra
 
 at 7. Finally, plaintiffs have demonstrated through testimony presented at
 
 *LVII
 
 trial that there is actual confusion between the two groups in the minds of the relevant population.
 
 See supra
 
 at 9-10.
 

 In addition to all of these factors, there is some evidence of intent to infringe — or bad faith — on the part of PRD-MD/VA in its continued use of the PRD name and insignia even after Mr. Rivera’s receipt of plaintiffs’ cease and desist letter of November 21, 2000.
 
 See supra
 
 at 10.
 
 See also Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Association,
 
 929 F.Supp. at 478 (bad faith evidenced in refusal to cease and desist use of mark after notification of infringement);
 
 National Rural Electric Cooperative Association v. National Agricultural Chemical Association,
 
 26 U.S.P.Q 2d at 1297 (same).
 

 Based upon its analysis of the foregoing factors, the Court concludes that plaintiffs have met the third prong of the
 
 Sears, Roebuck
 
 standard. The plaintiffs therefore have demonstrated that defendants are in violation of Section 43(a) of the Lanham Act.
 

 2. Common Law Trademark Infringement
 

 The analysis with respect to the parties’ common law trademark infringement claims mirrors the analysis conducted for federal statutory trademark/unfair competition claims.
 
 See Russian Academy of Sciences, et al. v. American Geophysical Union,
 
 1998 U.S. Dist. LEXIS 20598, at *10;
 
 see generally American Association for the Advancement of Science v. Hearst Corp.,
 
 498 F.Supp. at 262. The resolution of the common law claim in plaintiffs’ favor and to defendants’ detriment therefore flows directly from the Court’s resolution of the Lanham Act claim.
 

 C.
 
 Irreparable Harm
 

 Trademark infringement “by its very nature causes irreparable injury.”
 
 The Appleseed Foundation, Inc. v. Appleseed Institute, Inc.,
 
 981 F.Supp. at 677.
 
 See also Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Association,
 
 929 F.Supp. at 478 (citing
 
 Crime Control, Inc. v. Crime Control, Inc.,
 
 624 F.Supp. 579, 581 (D.D.C.1984)) (trademark infringement raises a presumption of irreparable harm). In this instance, PRD-DC is claiming that the infringement has resulted in its loss of control over its reputation and in injury to its goodwill, which, they argue, are harms that are not com-pensable in money damages and therefore justify injunctive relief.
 
 See Russian Academy of Sciences, et al. v. American Geophysical Union,
 
 1998 U.S. Dist. LEXIS 20598, at *30 (citing
 
 Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Association,
 
 929 F.Supp. at 478);
 
 American Association for the Advancement of Science v. Hearst Corp.,
 
 498 F.Supp. at 262. As the court of appeals has noted, “[sjource, reputation and good will are as important to eleemosynary institutions as they are to business organizations .... [An organization’s] financial credibility to raise funds, its general reputation, the reputation of those managing and supporting it, are all at stake if its name is used by some other organization and the two become confused in the minds of the public.”
 
 American Gold Star Mothers, Inc. v. National Gold Star Mothers, Inc.,
 
 191 F.2d 488, 489 (D.C.Cir.1951).
 

 The fact that PRD-MD/VA holds itself out as an official seccional has caused confusion among those individuals who seek to be involved in an authorized seccional in the Washington, D.C. metropolitan area. It also has resulted in the donation of funds for PRD-related activities to an unauthorized group.
 
 See supra
 
 at 9-10. In addi
 
 *LVIII
 
 tion, to the extent that PRD-MD/VA is attempting to broaden its scope of activities beyond that of PRD-DC,
 
 see supra
 
 at 9-10, such an effort may be construed by members of the relevant population as a shift of PRD-DC’s mission to PRD-DC’s detriment.
 

 Confusion among political organizations risks an additional, unique harm. As the Second Circuit concluded:
 

 a political organization that adopts a platform and endorses a candidate under a trade name performs the valuable service of communicating to voters that it has determined that the election of those candidates would be beneficial to the objectives of the organization.... If different organizations were permitted to employ the same trade name in endorsing candidates, voters would be unable to derive any significance from an endorsement, as they would not know whether the endorsement came from the organization whose objectives they shared or from another organization using the same name.... The resulting confusion would be catastrophic; voters would have no way of understanding the significance of an endorsement or position taken by parties of recognized major names.
 

 United We Stand America, Inc. v. United We Stand, America New York, Inc.,
 
 128 F.3d at 90-91. Because seccionáis have a formal role in the nomination of the PRD presidential candidate, PRD-MD/VA’s continued presentation of itself as an authorized seccional risks not only confusion among the relevant population as to PRD-DC’s positions, but also risks the compromise of the PRD political process in the Dominican Republic. The Court therefore concludes that plaintiffs have demonstrated irreparable harm and a threat of continuing irreparable harm should PRD-MD/VA continue to hold itself out as an authorized seccional.
 

 D.
 
 Balance of Harms and the Public Interest
 

 The Court also concludes that the balance of harms weighs in plaintiffs’ favor. Plaintiffs have functioned under the name and insignia of the PRD for over twenty years. The designation as an authorized seccional comes with benefits and responsibilities that have great significance for its members, including their official representation in the political process in the Dominican Republic. The undermining of the group’s reputation and goodwill and the impact on its members put the receipt of those benefits and the fulfillment of those responsibilities at risk. By contrast, any harm that defendants claim is mitigated by the fact that it is not authorized to function under the name and insignia of the PRD in the first place and has been in existence for a much shorter period of time. “[T]he balance of harms cannot favor a defendant whose injury results from the knowing infringement on the plaintiffs trademark.”
 
 Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Association,
 
 929 F.Supp. at 478.
 
 See also Russian Academy of Sciences, et al. v. American Geophysical Union,
 
 1998 U.S. Dist. LEXIS 20598, at *30;
 
 The Appleseed Foundation, Inc. v. Appleseed Institute, Inc.,
 
 981 F.Supp. at 675. Finally, because PRD-DC is the only authorized seccional in the metropolitan area, there is a public interest in preventing PRD-MD/VA from representing itself as a competing authorized seccional.
 

 III. CONCLUSION
 

 For the foregoing reasons, the Court concludes that plaintiffs have met their burden of demonstrating their entitlement to a permanent injunction. It therefore will grant plaintiffs’ motion and will deny
 
 *LIX
 
 defendants’ motion. An Order consistent with this Opinion shall issue this same day.
 

 SO ORDERED.
 

 ORDER
 

 For the reasons stated in a separate Opinion issued this same day, it is hereby
 

 ORDERED that plaintiffs’ Motion for a Permanent Injunction [35-1] is GRANTED; it is
 

 FURTHER ORDERED that Defendants/Counterclaimants’ Motion for a Permanent Injunction [36-1] is DENIED; it is
 

 FURTHER ORDERED that defendants are enjoined from using the name “Partido Revolucionario Domincano” or any variation thereof
 
 (see
 
 Opinion at 5-6 n. 3), or the insignia thereof; it is
 

 FURTHER ORDERED that defendants are enjoined from distributing materials that incorporate in any manner the name “Partido Revolucionario Domincano” or any variation thereof, or the insignia thereof; it is
 

 FURTHER ORDERED that defendants are enjoined from engaging in fund-raising or any other activities intended to solicit money or donations from the public while using the name “Partido Revolucion-ario Domincano” or any variation thereof, or the insignia thereof; it is
 

 FURTHER ORDERED that defendants are enjoined from attempting to register members for any organization through the use of the name “Partido Re-volucionario Domincano” or any variation thereof, or the use of the insignia thereof; it is
 

 FURTHER ORDERED that defendants are enjoined from implying in any manner whatsoever that “Partido Revolu-cionario Domincano, Seccional de Maryland y Virginia” is an authorized seccional of the Partido Revolucionario Domincano, or that any such organization is affiliated with plaintiffs’ organization or the Partido Revolucionario Domincano; it is
 

 FURTHER ORDERED that on or before April 14, 2004, plaintiffs shall file a memorandum indicating whether final judgment in this matter should be entered; and if final judgment is not appropriate, delineating what issues remain for resolution; and it is
 

 FURTHER ORDERED that defendants shall file a response to plaintiffs’ memorandum on or before April 26, 2004.
 

 SO ORDERED.
 

 [1]
 

 . Upon consideration of the arguments presented in post-trial briefs, the Court has excluded one exhibit and a portion of another offered by defendants on grounds of hearsay, as reflected in a separate Opinion and Order issued this same day.
 

 [2]
 

 . An official transcript was generated for the proceedings that took place on October 11, 2002. No official transcript exists for the November 19 and November 20, 2002 proceedings, however. Accordingly, citation to the transcript refers to testimony given on October 11, 2002. Citations to testimony given on November 19, 2002 and November 20, 2002 is designated accordingly.
 

 [3]
 

 . Defendants use all of the following names in reference to their group: (1) Partido Revolu-cionario Dominicano, Seccional del PRD De los Estados de Maryland y Virginia “Don Antonio Guzman Fernandez;” (2) Partido RE-VOLUCIONARIO Dominicano, Seccional del PRD De los Estados de Maryland y Virginia; (3) Partido REVOLUCIONARIO Dominicano, Seccional Maryland y Virginia “Don Antonio Guzman Fernandez;” (4) Partido REVOLU-CIONARIO Dominicano, Seccional de Maryland y Virginia; (5) Seccional Maryland y Virginia, Partido REVOLUCIONARIO Domin-icano; and (6) Seccional P.R.D. *Don Antonio Guzman.*
 
 See
 
 Lantigua Aff. ¶ 8.
 

 [4]
 

 .Between 1996 and September 2000, PRD-MD/VA represented itself as a proposed sec-cional, and placed the word “projecto” — or proposed — in front of any announcement in which it used PRD-MD/VA or one of the group's names. See Romero Test. (Nov. 20, 2002). Dr. Lantigua testified that although it is not mentioned in the By-laws, an "approved” proposed branch or projecto may use the name and insignia of the PRD if it incorporates "projecto” in the name.
 
 See
 
 Lantigua Test. (Nov. 19, 2002). This testimony is unre-futed by plaintiffs, but there is no evidence other than defendants' use of the title that PRD-MD/VA was an "approved” proposed seccional or what the PRD requires in order for a group to become an authorized proposed seccional. While Mr. Jimenez also discussed the use by PRD-MD/VA of the title "projecto” prior to September 2000 in describing the group's effort to become an approved seccional, he did not offer any detail as to whether his group actually had been approved as a proposed seccional.
 
 See
 
 Tr. 110:25-114:15 (F.Jimenez). The Court therefore concludes that the use of "projecto” in any manner by defendants does not immunize PRD-MD/VA from plaintiffs' claims with respect to the misuse of the name and insignia of the PRD. Furthermore, even if PRD-MD/VA was authorized to use the PRD name and insignia accompanied by "projecto,” it ceased using "projecto” in September 2000.
 

 [5]
 

 . Similarly, the fact that members of other seccionáis within the United States treated PRD-MD/VA as an official seccional at the September 30, 2000 "inauguration” and at a subsequent meeting in New York City,
 
 see
 
 Lantigua Test. (Nov. 19., 2002), is irrelevant to whether PRD-MD/VA is in fact an authorized seccional.
 

 [6]
 

 . Although he did
 
 not
 
 discuss it in his affidavit, Dr. Lantigua also testified at trial that he had received a telephone call from the then-current PRD President Hatuey DeCamps informing him that PRD-MD/VA had been authorized as a seccional, but that he did not know the date or time of the call.
 
 See
 
 Lanti-
 
 *LI
 
 gua Test. (Nov. 19, 2002). The Court orally ruled, however, that the call and its contents were inadmissible hearsay. Dr. Lantigua also testified that he had been informed by phone that other seccionáis had been authorized, but he could not testify as to the details of those other calls.
 

 [7]
 

 . Defendants' presentation of witnesses who testified that they have not seen any confusion between the two groups,
 
 see
 
 Rodriguez Test. (Nov. 19, 2002); Lantigua Test. (Nov. 19, 2002), does not enervate plaintiffs' evidence that confusion between the groups existed.
 

 [8]
 

 . This factor also is characterized as "the intent of the junior user.”
 
 The Appleseed Foundation, Inc.
 
 v.
 
 Appleseed Institute, Inc.,
 
 981 F.Supp. at 675.
 

 [9]
 

 . The fact that PRD-MD/VA included "Maryland y Virginia” in its name would not necessarily indicate to the relevant population that it was a new group, especially to those members of PRD-DC who reside in Maryland and Virginia. While PRD-DC may have added to the confusion between the groups by adding "Metropolitana de Washington D.C., Maryland y Virginia,” to its name in 2000, defendants’ lack of authority to use the PRD name and insignia in the first instance diffuses this argument.